# STATE OF MICHIGAN

# COURT OF APPEALS

LALE ROBERTS and JOAN ROBERTS,

Plaintiffs-Appellants,

v

KATHRYN SALMI, LPC, d/b/a SALMI
CHRISTIAN COUNSELING,

Defendant-Appellee.

FOR PUBLICATION
December 18, 2014
9:20 a.m.

No. 316068
Houghton Circuit Court
LC No. 2012-015075-NH

Before: MURPHY, C.J., and SAWYER and M. J. KELLY, JJ.

M. J. KELLY, J.

In this suit for malpractice, plaintiffs Lale Roberts and Joan Roberts appeal by right the trial court's order dismissing their claims against defendant, Kathryn Salmi, LPC, who does business as Salmi Christian Counseling. On appeal, we must determine whether a mental health professional, such as a licensed professional counselor, see MCL 330.1100b(16)(e); 333.18101(b),[1] owes a duty of care to third persons who might be harmed by the professional's treatment of his or her patients. Specifically, we must determine whether a mental health professional has a duty to third parties (specifically, a patient's parents) who might foreseeably be implicated in abuse when the mental health professional treats a patient using techniques that cause his or her patient to have false memories of sexual abuse. For the reasons more fully explained below, we conclude that Michigan's common law recognizes a duty of care to third parties who might foreseeably be harmed by the mental health professional's use of techniques that cause his or her patient to have false memories of sexual abuse. Because the trial court erred when it dismissed Lale and Joan Roberts' claim on the grounds that Michigan does not recognize such a duty, we reverse and remand for further proceedings.

---

[1] The Legislature has extended the definition of medical malpractice to include licensed professional counselors. *Bryant v Oakpointe Villa Nursing Centre, Inc*, 471 Mich 411, 420 n 8; 684 NW2d 864 (2004); see also MCL 600.5838a(1)(b); MCL 333.18101(b).

# I. BASIC FACTS

In 2009, Lale and Joan Roberts had two daughters living with them at home: L, who is a person with Down Syndrome, and her older sister, K. After it was discovered that a friend of the family had engaged in inappropriate sexual contact with K, Lale and Joan Roberts sought help for K from a mental health professional. Eventually Lale and Joan Roberts hired Salmi to provide counseling to K. K began to see Salmi in July 2009. K was 17 years of age when she first started counseling with Salmi. K began to live with family friends at around the same time.

Shortly after Salmi began to counsel K, K purportedly remembered that her father had physically and sexually abused her since she was five years old. Salmi invited Lale and Joan Roberts to attend a group counseling session, which was held in July 2009. At the group counseling session, K allegedly confronted her father with what Lale and Joan Roberts maintain were false allegations of sexual abuse.

In September 2009, Salmi reported the allegations to the Department of Human services. Salmi provided the investigators with a handwritten note wherein she described the abuse that K "just remembered." In the note Salmi stated that K told her that L was also abused at home. Thereafter, the Department of Human services and the Michigan State Police investigated the allegations.

The investigators found no physical evidence that L had been or was being physically or sexually abused. An investigator with the Department interviewed K and K's allegations, as recorded by the investigator, were strikingly similar to that provided by Salmi in her note. An investigator also interviewed K's older sister, who had not lived in the home for several years. She described her parents as fundamentalist Christians who hold strong beliefs and practice discipline that she felt was emotionally and physically abusive, but she nevertheless stated that she did not believe that her father would hurt L or K. She also stated that she never observed anything that could be characterized as sexual abuse in the home. The investigator ultimately determined that it was unnecessary to take any action. Police officers also investigated and reviewed K's allegations, but no charges were brought against Lale or Joan Roberts.

In January 2012, Lale and Joan Roberts sued Salmi for ordinary negligence or malpractice. They alleged that they sent K to Salmi for counseling and Salmi treated K with "Recovered Memory Therapy." In July 2009, they further alleged, Salmi invited them to a "joint counseling session." At the session, K confronted her father with "false accusations of severe physical and sexual abuse." They maintained that Salmi owed them a duty to "not improperly implant, or reinforce false memories of physical and sexual abuse in K's mind by use of hypnosis, age regression and other psychotherapy techniques." Lale and Joan Roberts stated that K only began to "remember" the abuse after she began treating with Salmi and was now "adamant" that those things actually happened. After Salmi "improperly implanted, or reinforced false memories of physical and sexual abuse," Lale and Joan maintained, K severed all ties with her parents, investigators subjected them to civil and criminal investigations, and the community become aware of the allegations.

In her affidavit of meritorious defense, Salmi averred that she does not offer or practice " 'Repressed or Recovered Memory Therapy' " and has "at no time . . . intentionally used any suggestive techniques with clients." She also stated that she had not been trained in hypnosis and does not use it in her practice. She addresses "claims or reports of sexual abuse when reported, but [does] not believe in exploring for such events or other traumas when not presented to me as an issue by the client."

In October 2012, Salmi moved for summary disposition under MCR 2.116(C)(8). She argued that the trial court should dismiss the claim because K's records were protected by privilege and, as such, Lale and Joan Roberts would be unable to show that Salmi negligently treated K. She also argued that, under Michigan's common law, she only owed a duty of care to K. Because third parties cannot sue a therapist for damages resulting from the therapist's malpractice or for treatment provided to others, she maintained, the court should dismiss the claim against her. Finally, she argued that Lale and Joan Roberts' claim was essentially a claim for the alienation of affections, which was abolished in Michigan.

The trial court held a hearing on the motion in January 2013. After hearing the parties' arguments, the trial court determined that it would be premature to dismiss the claim on the ground that Lale and Joan Roberts would, as a result of client-therapist privilege, be unable to discover the evidence necessary to establish their clam. It also did not believe that their complaint was for alienation of affections or barred by the line of cases involving claims of malpractice made by members of the patient's family. The trial court, however, agreed that— under Michigan law—Salmi had no duty of care to avoid harming third parties with her treatment of K. For that reason, the trial court entered an order dismissing Lale and Joan Roberts' claim later that same month.

After the trial court eventually denied their motion for reconsideration in April 2013, Lale and Joan Roberts appealed in this Court.

## II. SUMMARY DISPOSITION

### A. STANDARDS OF REVIEW

On appeal, Lale and Joan Roberts argue that the trial court erred when it determined that, under Michigan law, Salmi did not owe any duty of care to ensure that her treatment of K did not harm them. This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). This Court also reviews de novo the proper scope and application of Michigan's common law. *Grandberry-Lovette v Garascia*, 303 Mich App 566, 572-573; 844 NW2d 178 (2014).

### B. MCR 2.116(C)(8)

A motion under MCR 2.116(C)(8) tests the legal sufficiency of the plaintiff's claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. *Bailey v Schaaf*, 494 Mich 595, 604; 835 NW2d 413 (2013). In reviewing such a challenge, this Court must accept the factual allegations stated in the complaint as true and construe them in a light most favorable to the nonmoving party. *Kuznar v Raksha Corp*, 481

Mich 169, 176; 750 NW2d 121 (2008). If the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery, the court should dismiss the claim. *Id.* Here, Salmi argued in support of her motion for summary disposition, in relevant part, that Lale and Joan Roberts' claim was unenforceable as a matter of law because they did not plead that Salmi breached a duty recognized under Michigan law.

## C. LEGAL DUTY

In order to establish a prima facie claim of negligence against Salmi, Lale and Joan Roberts had to establish that Salmi owed them a legal duty. *Hill v Sears, Roebuck and Co*, 492 Mich 651, 660; 822 NW2d 190 (2012) (stating that it is axiomatic that there can be no tort liability unless the plaintiff first establishes that the defendant owed a duty to the plaintiff). Whether Salmi owed Lale and Joan Roberts a duty under the circumstances involved in this case is a question of first impression in Michigan.

" 'Duty' comprehends whether the defendant is under *any* obligation to the plaintiff to avoid negligent conduct; it does not include—where there is *an* obligation—the nature of the obligation: the general standard of care and the specific standard of care." *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977). Whether a defendant owes an actionable legal duty to the plaintiff is a question of law that must be decided by the court after " 'assessing the competing policy considerations for and against recognizing the duty.' " *In re Certified Question from the Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 504-505; 740 NW2d 206 (2007), quoting *Friedman v Dozorc*, 412 Mich 1, 22; 312 NW2d 585 (1981). "Thus, the ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." *Id.* at 505.

When assessing the competing policy considerations for and against recognizing a duty, the nature of the relationship between the parties and the foreseeability of the harm are paramount:

> Factors relevant to the determination whether a legal duty exists include [] "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." We have recognized, however, that "[t]he most important factor to be considered [in this analysis] is the relationship of the parties" and also that there can be no duty imposed when the harm is not foreseeable. In other words, "[b]efore a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable." If either of these two factors is lacking, then it is unnecessary to consider any of the remaining factors. [*Hill*, 492 Mich at 661 (citations omitted).]

-4-

1. RELATIONSHIP AND FORESEEABILITY

For purposes of our analysis, we shall assume that Salmi had a professional-patient relationship with K and not her parents.[2] In a medical malpractice action, the duty owed by the health professional arises from the health professional's relationship with the patient. *Oja v Kin*, 229 Mich App 184, 187; 581 NW2d 739 (1998). A health professional's duty to perform within the standard of care normally extends only to the health professional's patient; as such, a plaintiff cannot sue in malpractice for derivative damages caused by a health professional's negligent treatment of a loved one. See, e.g., *Malik v William Beaumont Hosp*, 168 Mich App 159, 168-170; 581 NW2d 739 (1998). But the absence of a direct professional-patient relationship between the professional and a third-party harmed by the professional's treatment does not by itself preclude the imposition of a duty. Courts have recognized that a professional may be liable in malpractice to a third-party for harms caused by his or her breach of the applicable standard of care notwithstanding the lack of a professional-client relationship with the third-party. See *Dyer v Trachtman*, 470 Mich 45, 51-54; 679 NW2d 311 (2004) (recognizing that a physician who performs an independent medical examination for a third party does not have a traditional physician-patient relationship with the person examined, but nevertheless stating that the physician owes a limited duty of care to the person examined and a breach of that duty sounds in medical malpractice); *Mieras v DeBona*, 452 Mich 278; 550 NW2d 202 (1996) (holding that a lawyer who drafts a will has a limited duty to the beneficiaries named in the will). Moreover, even in the absence of a professional-patient relationship, Michigan's common law imposes on every person a general obligation to refrain from taking actions that unreasonably endanger others: "every person engaged in the prosecution of any undertaking [has] an obligation to use due care, or to so govern his [or her] actions as not to unreasonably endanger the person or property of others." *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967). Consequently, within the context of the facts of this case, the question becomes whether the parents of a patient being treated by a mental health professional are sufficiently connected to the patient's treatment to warrant the imposition of a limited duty of care on the mental health professional to avoid treating the patient in a way that might harm the parents. Because this question is interconnected with the nature of the treatment at issue and the foreseeability that the treatment will harm a patient's parents, it will be useful to discuss recovered memory theory.[3] See *Moning*, 400 Mich at 439 (noting that whether there is a requisite relationship giving rise to a duty will often depend on issues of foreseeability—namely, "whether it is foreseeable that the actor's conduct may create a risk of harm to the victim, and whether the result of that conduct and the intervening causes were foreseeable").

---

[2] Because we conclude that mental health professionals owe a duty to the parents of a patient because the parents are within the class of persons most likely to be harmed when the professional negligently causes his or her patient to have false memories of sexual abuse, we need not determine whether Lale and Joan Roberts' payment of the services for K or participation in a group session established a professional-patient relationship with Salmi.

[3] Lale and Joan Roberts alleged that Salmi treated K with "Recovered Memory Therapy", which in turn caused K to have false memories of sexual abuse. We must accept these allegations as true for purposes of this motion. *Kuznar*, 481 Mich at 176.

As there developed a heightened awareness of the prevalence of child sexual abuse, some mental health professionals began to subscribe to the position that a wide variety of problems, such as sleep and eating disorders, had their origin with repressed memories of sexual abuse during childhood. See Note, *A Claim for Third Party Standing in Malpractice Cases Involving Repressed Memory Syndrome*, 37 Wm & Mary L Rev 337, 339 (1995). These mental health professionals adopted the theory—referred to as recovered memory theory—that persons suffering from these disorders can best be helped by awakening the dormant memories through recovered memory therapy and then confronting their abusers. *Id.* at 339-340. Therapists who subscribe to this theory might employ a wide range of tools—including drugs, hypnosis, guided fantasy, automatic writing, support groups, suggestion, interpersonal pressure, and appeals to authority—in order to cause the patient to recover the memories of sexual abuse, if the patient has no memory of abuse. See Note, *Has Time Rewritten Every Line?: Recovered-Memory Therapy and the Potential Expansion of Psychotherapist Liability*, 53 Wash & Lee L Rev 763, 770 (1996). Recovered memory theory has, however, come under increasing scrutiny by members of the mental health community who are skeptical of its validity:

> The idea that childhood sexual abuse may result in suppression of memory such that the victim may not remember it until many years later under the guidance of a psychotherapist is, to say the least, a controversial one *within* the psychotherapeutic community. Much of the force of the idea originated with one book, The Courage to Heal (1992), by Ellen Bass and Laura Davis, which traces a variety of psychological disorders to unremembered early childhood sexual abuse. The high-water mark of acceptance of the theory appears to have been the adoption by many state legislatures, including California's, of special, relaxed statutes of limitations which implicitly accept the idea that a victim of sexual abuse may not have reason to know of the abuse until many years after its occurrence. . . .

> As the end of the 20th century approaches, however, recovered memory theory finds itself on the intellectual defensive. In 1992 a group of families torn asunder by false accusations of child abuse formed the False Memory Syndrome Foundation to combat the idea. Commentators have noted that the pendulum is now swinging the other way. Many psychotherapists now see recovered memory theory as a " 'widespread and ... damaging' fad." And, indeed, the case against the idea that someone may so repress a memory of sexual abuse that he or she will have no awareness of it until adulthood is formidable - so formidable in fact that we doubt (though we stress we do not decide the point now) that recovered memory will pass muster under the *Kelly* test (formerly the *Kelly-Frye* test) for admissibility. . . . [*Trear v Silis*, 69 Cal App 4th 1341, 1344-1346; 82 Cal Rptr 2d 281 (1999) (citations and footnotes omitted).]

Many mental health professionals now question the evidence that victims of abuse can completely repress memory of the abuse only to recover the memories decades later with complete accuracy. See Finer, *Therapists' Liability to the Falsely Accused for Inducing Illusory Memories of Childhood Sexual Abuse-Current Remedies and a Proposed Statute*, 11 J L & Health 45, 68-82 (1997) (discussing the debate among mental health professionals concerning the repression and retrieval of traumatic memories). Opponents of recovered memory therapy

also point to studies that suggest that the techniques used in the therapy do not enable patients to recall real events, but instead "results in therapists negligently suggesting, implanting, and reinforcing false beliefs of childhood sexual abuse in their patients." Comment, *False Memories and the Public Policy Debate: Toward A Heightened Standard of Care for Psychotherapy*, 2002 Wis L Rev 169, 171; see also Piper, Lillevik, Kritzer, *What's Wrong With Believing in Repression? A Review for Legal Professionals*, 14 Psych Pub Pol'y & L 223 (discussing the flaws in the studies that support repressed memory theory and the concept of recovered memories). "The danger of these techniques," one commentator explained, "is that the therapist validates the 'memories' by encouraging their creation and rewarding the patient with positive feedback when she 'remembers' anything." *A Claim for Third Party Standing*, 37 William & Mary L Rev at 351, citing Loftus & Ketcham, *The Myth of Repressed Memory* (1994), p 24.

Child sexual abuse is one of the most heinous offenses that a person can commit. And, for that reason, there is nothing more stigmatizing than being branded a child molester. See *Trear*, 69 Cal App 4th at 1346 ("It takes very little imagination to recognize the damning horror that must ensue to a parent *falsely* accused of child molestation."). Given the protracted and contentious debate over the science underlying repressed and recovered memories and the evidence that therapy techniques designed to help a patient recover memories might in fact implant false memories, a reasonable mental health professional should understand the potential for harm occasioned by the use of such techniques to treat a patient and should proceed with the utmost caution. This is especially true when the therapist's only evidence of abuse is the fact that the patient has sought help. The patient himself or herself is obviously harmed when a mental health professional uses techniques that give rise to false memories of sexual abuse. But in addition, a therapist who uses such techniques in order to help a patient recover memories of sexual abuse from childhood, on the assumption that such abuse occurred, must also know that the persons most likely to be implicated in the abuse (perhaps falsely) are the patient's parents. See *Hungerford v Jones*, 143 NH 208, 213; 722 A2d 478 (1998) (recognizing that family members are more likely victims of false accusations than nonfamily members). It is, therefore, entirely foreseeable that the use of suggestive techniques to recover memories might result in the creation of false memories of abuse by the patient's parent or parents and that the patient will act—with or without encouragement—on the belief that the memories are accurate. See *Trear*, 69 Cal App 4th at 1348 ("[T]here is the judicial temptation to allow parents damaged by recovered memory claims a tort recovery in professional malpractice based on the obvious foreseeability of the harm to the parent from the 'false' memory.").

The same cannot be said of a mental health professional's diagnosis of childhood sexual abuse standing alone. A diagnosis does not by itself implicate any particular person as the perpetrator of the abuse. Moreover, a patient confronted with such a diagnosis and no memory of the abuse is less likely to act on the diagnosis to his or her parent's detriment. In the absence of evidence that the professional contributed to or caused the formation of a false memory or otherwise encouraged the patient to falsely implicate his or her parents, the mere diagnosis of

childhood sexual abuse as the underlying cause of a mental disorder does not result in a direct foreseeable harm to the patient's parents.[4]

Because a patient's parents are within the class of persons most likely to be implicated by the creation of a false memory, when a mental health professional elects to treat a patient using techniques that might give rise to false memories in the patient, the mental health professional must consider not only the patient's welfare, but also the possibility that his or her decision to treat the patient in that way might result in a false memory that directly harms the patient's parents. The parent-child relationship is so fundamental to human relations that a parent cannot be equated with a third party in the ordinary sense. *Webb v Neuroeducation Inc, PC*, 121 Wash App 336, 350; 88 P3d 417 (2004). And when a therapist's inept use of therapeutic techniques causes his or her patient to have false memories and make false allegations of sexual abuse, the harm is foreseeable and strikes "at the core of a parent's basic emotional security." *Id.* (quotation marks and citation omitted). Stated another way, although the mental health professional does not have a direct professional-patient relationship with his or her patient's parents, it cannot be said that the mental health professional's connection to his or her patient's parents is so tenuous that it cannot give rise to any duty of care. See *In re Certified Question*, 479 Mich at 515 (characterizing the connection between the decedent and the manufacturer as "highly tenuous" because she was separated from the manufacturer by several intermediate relationships). Rather, the mental health professional who employs therapies that might give rise to a false memory has a substantial connection to the persons most likely to be harmed by the implantation of the false memory: the patient's parents.[5] See *Hungerford*, 143 NH at 213.

We note that this case does not involve a situation where this Court is asked to analyze whether the mental health professional has a duty to protect his or her patient's parents from false accusations of sexual abuse. The allegations here are not that a mental health professional has a duty to ensure that a patient's allegations are true before reporting them or to otherwise protect a patient's parents from potentially false allegations of sexual abuse. Rather, this case involves allegations of professional misfeasance—namely, the negligent use of therapeutic techniques on a patient that actually *cause* the patient to have a false memory of childhood sexual abuse. See *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498; 418 NW2d 381 (1988) ("In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm."). Furthermore, the

---

[4] We do not mean to suggest that a misdiagnosis of childhood sexual abuse can never be relevant; evidence that the mental health professional misdiagnosed his or her patient as having been sexually abused as a child may be relevant to show that a reasonable mental health professional confronted with the same situation would not have proceeded to use questionable techniques to help the patient recover memories.

[5] The present case involves only whether a mental health professional owes a duty of care to his or her patient's parents. We leave it to future courts to determine whether the duty should be extended to other persons who might foreseeably be harmed by a patient's false memory of sexual abuse, such as a pastor or teacher.

fact that the patient might be the active agent in the perpetration of the harm does not transform the case from one of misfeasance to one of nonfeasance.[6] See *Ross v Glaser*, 220 Mich app 183, 187-190; 559 NW2d 331 (1996) (opinion by MARILYN KELLY, J.) (characterizing the defendant's act of handing a loaded gun to his mentally unstable son as misfeasance, not nonfeasance, and holding that the defendant had a duty to refrain from handing his son the gun, given the likelihood that his son would injure someone with it). Because the nature of the duty is limited to considering whether a mental health professional may be held liable for implanting a false memory of sexual abuse, we conclude that the relationship between a mental health professional and his or her patient's parents is sufficiently close and the foreseeability of the harm sufficiently strong to weigh in favor of a limited duty of care.[7]

## 2. POLICY CONSIDERATIONS

Having determined that the relationship between a mental health professional and his or her patient's parents weighs in favor of imposing a limited duty, we must next consider the "competing policy considerations for and against recognizing the duty." *In re Certified Question*, 479 Mich at 505 (quotation marks and citation omitted). We must consider the burden on the defendant and the nature of the risk presented. *Id.* If the social benefits of imposing the duty are outweighed by the social costs, courts will not recognize a duty. *Hill*, 492 Mich at 669-670. Thus, if the burden to be imposed on mental health professionals would be "onerous and unworkable" or would shift the burden to protect from the party best equipped to prevent the hazard, we will not recognize the duty. *Id.* at 670.

Courts in several states have examined the competing policy considerations and concluded that the social cost of imposing such a duty outweighs the potential benefits.[8] Those courts have been concerned that the imposition of a duty would unduly interfere with the mental health professional's ability to diagnose and treat his or her patients:

---

[6] The cases involving the duty to act for another's benefit as a result of a special relationship are, therefore, inapposite. See *Dawe v Dr. Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 25-26; 780 NW2d 272 (2010) (stating that generally there is no duty that obligates one person to aid or protect another, but that certain special relationships may give rise to such a duty).

[7] Lale and Joan Roberts also alleged that Salmi improperly diagnosed K and that the improper diagnosis caused their damages. However, for the reasons already stated, we do not recognize that a mental health professional may be liable to third parties solely for misdiagnosing his or her patient with having been sexually abused. Rather, there must be a more significant connection between the harm and the mental health professional's acts or omissions.

[8] See *Ramsey v Yavapi Family Advocacy Ctr*, 225 Ariz 132; 235 P3d 285 (Ariz App, 2010); *PT v Richard Hall Community Health Care Ctr*, 364 NJ Super 561; 837 A2d 436 (2002); *Althaus v Cohen*, 562 Pa 547; 756 A2d 1166 (2000); *Paulson v Sternlof*, 15 P3d 981 (Ok App, 2000); *Doe v McKay*, 183 Ill 2d 272; 700 NE2d 1018 (1998); *Flanders v Cooper*, 706 A2d 589 (Me, 1998); *Zamstein v Marvasti*, 240 Conn 549; 692 A2d 781 (1997); *Bird v WCW*, 868 SW2d 767 (Tex, 1994).

The issue presented by a claim of a duty to the potential "third party" abuser is to what degree therapists necessarily become *insurers* of the truth of any diagnosis of childhood sexual abuse by a parent. We say "insurers" because a moment's reflection will demonstrate the perilous position in which any such duty would put the therapist. The therapist risks utter professional failure in his or her duty to the *patient* if possible childhood sexual abuse is ignored. On the other hand, if the heinous crime of (recently discovered) childhood sexual abuse really is the cause of the patient's disorders, then it is virtually inevitable that the alleged abuser will suffer "harm."

Of course, it can be argued that no patient is well served by an *incorrect* "diagnosis" of childhood sexual abuse hitherto supposedly repressed in the memory: One might surmise that the legal solution is to use the law of negligence to impose discipline on the therapist to *get the diagnosis right*. But in the context of what must necessarily be an inquiry involving at least a potentially adversarial relationship, that so-called "solution" would be unrealistic in the extreme. [*Trear*, 69 Cal App 4th at 1351.]

The imposition of such a duty, the court in *Trear* stated, would expose the mental health professional to inherently conflicting incentives: a duty to a potential abuser that might interfere with and deprive the patient of the benefit of the professional's treatment. *Id.* at 1351-1352. The mental health professional would be left with no leeway to decide whether the patient really was abused. *Id.* at 1352. This would in turn lead to the practice of defensive therapy:

[G]iven the problem of unverifiability and the role that the possibility of early childhood sexual abuse has played in the history of psychotherapy (e.g., the early Freud), it would be an *undue* burden on therapists to force them into a position where they must be 100 percent accurate in every case. "Defensive" therapy practiced under the sword of liability if a therapist is wrong about a recovered memory can hardly serve the person to whom the therapist's duty unquestionably does run: the patient. And by the same token the consequences to the community of imposing a duty running to third parties means a disincentive to diagnose and remedy the serious social ill of child molestation by the very profession best suited to remedy it. [*Id.* at 1355-1356.]

We wholeheartedly agree that the detection and eradication of child sexual abuse is an important societal goal. See *Hungerford*, 143 NH at 212. However, we do not agree that recognizing a limited duty of care to third parties would unduly burden a mental health professional's ability to diagnose and treat his or her patients for trauma originating from childhood sexual abuse. The duty here is not whether a mental health professional can in good faith diagnose his or her patient with having psychological issues that were caused by childhood sexual abuse. At issue is whether a mental health professional has the unfettered right to treat his or her patient using techniques that may cause the patient to develop a *false memory* of sexual abuse.

A carefully crafted duty would not implicate a mental health professional confronted with a patient who relates that he or she has been abused without having been subjected to therapies that may induce false memories. The duty would only apply when the mental health professional elects to treat his or her patient using techniques that may cause false memories—in which case, the mental health professional must take steps to limit that possibility. Moreover, the plaintiff would bear the burden of proving by a preponderance of the evidence that the patient's memories of childhood sexual abuse are actually false. Even when a mental health professional uses a therapeutic technique that actually causes a patient to have a false memory of sexual abuse, the duty could be further limited so that the mental health professional would not be liable if a reasonable mental health professional would have employed the technique under the circumstances, notwithstanding the apparent risk. Accordingly, with a properly limited duty, the mental health professional would have the full array of therapeutic techniques at his or her disposal, subject only to the duty to treat his or her patient in a way that minimizes the risk that the patient will develop false memories of childhood sexual abuse. This standard is the same standard that already applies to mental health professionals: they must treat their patients with "competent and carefully considered judgment." *Hungerford*, 143 NH at 214 (quotation marks and citation omitted).

While the burden on a mental health professional can be minimized with a carefully crafted duty, the failure to recognize such a duty might encourage the continued use of questionable therapeutic techniques on uninformed patients. This might continue despite the fact that there is plainly no social benefit to the creation of a false memory in a patient. A false memory of sexual abuse will not benefit the patient and may indeed cause him or her severe emotional harm. In addition, an accusation of child molestation arising from a false memory will likely sunder families, ruin marriages, and destroy lives:

> It is indisputable that "being labeled a child abuser [is] one of the most loathsome labels in society" and most often results in grave physical, emotional, professional, and personal ramifications. This is particularly so where a parent has been identified as the perpetrator. Even when such an accusation is proven to be false, it is unlikely that social stigma, damage to personal relationships, and emotional turmoil can be avoided. In fact, the harm caused by misdiagnosis often extends beyond the accused parent and devastates the entire family. Society also suffers because false accusations cast doubt on true claims of abuse, and thus undermine valuable efforts to identify and eradicate sexual abuse. [*Hungerford*, 143 NH at 212.]

Finally, the mental health professional is in the best position to avoid the harm caused by the introduction of false memories. The mental health professional alone is responsible for the methods used in treatment; the patient must trust that the mental health professional will pursue a course of treatment guided by competent professional judgment. Similarly, the persons most intimately connected with the patient—his or her parents—have a right to expect that a mental health professional will not cause the patient to have false memories of childhood sexual abuse. *Id.* at 214 ("Because the therapist is in the best position to avoid harm to the accused parent and is solely responsible for the treatment procedure, an accused parent should have the right to reasonably expect that a determination of sexual abuse, touching him or her as profoundly as it will, will be carefully made, in those cases where the diagnosis is publicized.") (quotation marks

-11-

and citation omitted). Accordingly, balancing the policy considerations also weighs in favor of recognizing that a mental health professional has a limited duty to his or her patient's parents; namely, a duty to ensure that the professional's treatment does not give rise to false memories of childhood sexual abuse.

## D. THE LIMITED DUTY

Society has a strong interest in protecting children from sexual abuse by identifying and punishing the perpetrators of sexual abuse, and treating the victims. But it also has long recognized the importance of protecting the fundamental bond between parent and child from unwarranted interference by third parties. See *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524 (2014). The nature of the relationship between parent and child is such that a reasonable mental health professional who undertakes to treat a patient understands that the treatment of the patient might cause harm to members of the patient's family. This is especially true in cases where the mental health professional suspects that his or her patient has been subjected to sexual abuse as a child. Because the patient's parents are not third parties in the ordinary sense, the mental health professional has a significant—if limited—relationship with the patient's parents. Given the foreseeability and severity of the harm accompanying false memories of sexual abuse, this relationship warrants the imposition of a limited duty of care on mental health professionals to the patient's parents.

On appeal, Salmi maintains that, given the policy considerations at issue, whether to impose a duty should properly be left to the Legislature. We must respectfully disagree; this Court has an obligation to decide what the common law rule shall be when the Legislature has not already spoken: "The law of negligence was created by common-law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative directive." *Moning*, 400 Mich at 436. And the fact that the Legislature might exercise its constitutional authority to reach a different choice at a later date should not dissuade the Court from deciding the issue when properly before it. *Id.* at 435.

After having carefully considered the issue, we join those jurisdictions that recognize that a mental health professional owes a duty of care to his or her patient's parents arising from the treatment of the patient.[9] However, because the mental health professional has a limited relationship with his or her patient's parents, we conclude that the duty that the professional owes to the parents should likewise be limited. See, e.g., *Dyer*, 470 Mich at 53. The mental health professional must exercise reasonable professional judgment to limit the possibility that his or her treatment of the patient will give rise to false memories of childhood sexual abuse. If the mental health professional utilizes inappropriate treatment techniques or inappropriately applies otherwise proper techniques, which cause the patient to have a false memory of sexual abuse by a parent, the mental health professional may be liable to the patient's parents for the harms occasioned by the false memories. In order to establish a claim for a breach of this duty, a plaintiff must show that the mental health professional breached the applicable standard of care

---

[9] See *Webb*, 121 Wash App 336; *Sawyer v Midelfort*, 227 Wis 2d 124; 595 NW2d 423 (1999); *Hungerford*, 143 NH 208; *Montoya v Bebensee*, 761 P2d 285 (Colo App, 1988).

in the selection or use of a therapeutic technique or combination of techniques, that the improper use of the therapy or therapies caused the patient to have false memories of childhood sexual abuse by the parent or parents, and that the existence of the false memories caused the parents' damages.

E.  RESPONSE TO THE CONCERNS OF THE DISSENT

We respectfully disagree with the concerns voiced by our colleague in the dissenting opinion.  The dissent concludes that the issue of whether a duty should be recognized under the circumstances of this case is best left for the Legislature.  The dissent relies heavily on *Henry v The Dow Chemical Co*, 473 Mich 63; 701 NW2d 684 (2005), in support of its proposition.  However, *Henry* did not concern the issue of "duty."  Rather, *Henry* addressed whether the Court should recognize an entirely new cause of action for medical monitoring premised, not on a present injury, but on the mere risk of disease that "*may* at some indefinite time in the future develop" as a result of the negligent release of dioxin.  *Id.* at 67.  Furthermore, in refusing to recognize such a claim, the Court in *Henry* emphasized that the Legislature had already acted to provide a remedy:

> The propriety of judicial deference to the legislative branch in expanding common-law causes of action is further underscored where, as here, the Legislature has already created a body of law that provides plaintiffs with a remedy.  Were we to create an alternate remedy in such cases—one that may be pursued in lieu of the remedy selected by our Legislature—we would essentially be acting as a competing legislative body.  And we would be doing so without the benefit of the many resources that inform legislative judgment.  [*Id.* at 92.]

Here, the Legislature has not created a body of law providing plaintiffs with a remedy.  Therefore, we are not acting as a competing legislative body in recognizing a limited duty.  We also note that the complexities in *Henry* far surpass those involved in this case.

In *Moning*, our Supreme Court held that a "manufacturer, wholesaler and retailer of a manufactured product owe a legal obligation [duty] of due care to a bystander affected by use of" a slingshot.  *Moning*, 400 Mich at 432.  The Court rejected the argument that, in recognizing such a duty, it was performing a legislative task.  *Id.* at 434.  The Court observed:

> The law of negligence was created by common law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative directive.  The Legislature has not approved or disapproved the manufacture of slingshots and their marketing directly to children; the Court perforce must decide what the common law rule shall be.  [*Id.* at 436.]

The Legislature has not spoken on the issue confronting us today; there is an absence of legislative directive.  Therefore, we must decide the issue of duty.  Our Supreme Court recently reiterated that it has not hesitated to examine and alter where necessary the common law in view of changes in societal institutions, mores, and problems, so as to determine which common-law rules best serve the citizens.  *People v Woolfolk*, ___ Mich ___, slip op at 3; ___ NW2d ___

(2014). We also note that in examining the factors set forth by the Supreme Court to be employed in determining whether a duty should be recognized, they do not include questioning whether we should defer to the Legislature, but instead require the Court to engage in assessing the competing policy considerations and the balancing of interests. See *In re Certified Question*, 479 Mich at 504-509. Moreover, a common-law duty of a psychiatrist to protect third persons from his or her patients under certain circumstances was recognized by this Court *before* the Legislature stepped in and enacted a comparable statutory duty under MCL 330.1946. *Davis v Lhim*, 124 Mich App 291, 298-301; 335 NW2d 481 (1983), rev'd on other grounds sub nom *Canon v Thumudo*, 430 Mich 326; 422 NW2d 688 (1988). Accordingly, and by analogy, we see no reason to await, perhaps indefinitely, action by the Legislature when this Court has the competence and authority to determine the existence of a common-law duty.

We disagree with the dissent's assessment that "[i]t is outside the expertise of this Court, or any future jury for that matter, to determine what is, or is not, an appropriate therapy method." We surmise and believe it indisputable that determinations of appropriate professional methods and standards are made regularly in the course of litigation throughout this state and the country, mainly through the aid of experts. Finally, the dissent's concerns regarding possible interference with the Legislature's enactment of mandatory reporting with respect to child abuse, MCL 722.623, are misplaced, given the *limited* nature of the duty that we recognize today; therapists are not placed in an untenable position.

### III. CONCLUSION

The trial court erred when it determined that Salmi did not owe K's parents a duty of care; Salmi had a limited duty to take reasonable steps to ensure that her treatment of K would not cause K to have false memories of childhood sexual abuse. Therefore, the trial court should not have dismissed Lale and Joan Roberts' claim on that basis.

Salmi argues on appeal that this Court should affirm for two alternate reasons. She states that this Court should affirm because Lale and Joan Roberts will be unable to secure the evidence necessary to prove their claim as a result of the privilege that protects the relationship between Salmi and K. This appeal involves the trial court's decision to dismiss under MCR 2.116(C)(8), which must be determined by examining the pleadings alone, see *Bailey*, 494 Mich at 604, and the parties have not yet had an adequate opportunity to conduct discovery and develop a factual record. Whether dismissal would be appropriate on that ground should be decided in the first instance by the trial court after a properly supported motion for summary disposition under MCR 2.116(C)(10). Accordingly, we decline to consider this alternate basis for affirming.

Salmi also argues that Lale and Joan Roberts' claim is essentially a claim for alienation of affection, which has been abolished under MCL 600.2901. As this Court has recognized, MCL 600.2901 broadly applies to all claims premised on the alienation of affections, not just the traditional situation involving the seduction of another person's spouse. *Nicholson v Han*, 12 Mich App 35, 39-40; 162 NW2d 313 (1968). However, Lale and Joan Roberts did not allege that Salmi acted with the intent to estrange K from them; they alleged that Salmi negligently treated K causing her to have false memories of sexual abuse, which in turn caused them damages. Lale and Joan Roberts' claim does indirectly involve the loss of K's society and companionship, but it is not premised solely on that harm. If able to prove their claim, Lale and

-14-

Joan Roberts would be entitled to damages for all the harms they suffered as a result of the false allegations. The fact that their claim involves the alienation of K's affections to some extent does not transform the essential character of the claim; as pleaded, the claim is for malpractice. Because they brought their claim to recover for their own injuries caused by Salmi's purported malpractice, Lale and Joan Roberts' claim is not barred by the statute abolishing claims for alienation of affection. See *Cotton v Kambly*, 101 Mich App 537, 539; 300 NW2d 627 (1980).

For the reasons stated, we reverse the trial court's decision to dismiss Lale and Joan Roberts' claim against Salmi on the ground that Salmi did not owe them any duty of care and remand for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. There being an important question of public policy, we order that the parties may not tax their costs. MCR 7.219(A).

/s/ Michael J. Kelly
/s/ William B. Murphy