*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD LEE KRICK,

        Plaintiff,

and

MARY LUCILLE KRICK,

        Plaintiff-Appellee,

v

H. PAUL SINGH, M.D., F.A.C.C., and WEST MICHIGAN CARDIOLOGY, PC,

        Defendants-Appellants.

UNPUBLISHED
July 21, 2022

No. 356763
Kent Circuit Court
LC No. 19-003120-NH

Before: SAWYER, P.J., and LETICA and PATEL, JJ.

PER CURIAM.

Defendants, H. Paul Singh, M.D., F.A.C.C. (Dr. Singh), and West Michigan Cardiology, PC, appeal by leave granted the trial court order granting in part and denying in part their motion for summary disposition of the claims raised by plaintiff Mary Lucille Krick (Mary).[1] We affirm.

---

[1] *Krick v Singh*, unpublished order of the Court of Appeals, entered June 16, 2021 (Docket No. 356763). The trial court granted the defense motion for summary disposition of Mary's claim of ordinary negligence but denied their challenge to the medical malpractice claim. Only the ruling pertaining to the medical malpractice claim is raised in this appeal.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On numerous occasions in 2001, plaintiff Ronald Lee Krick (Ronald) passed out. In 2002, doctors at the Mayo Clinic determined that Ronald's condition was caused by swallow syncope.[2] The doctors implanted a pacemaker into Ronald to remedy the syncope. After the pacemaker was implanted, Ronald did not pass out again until November 13, 2016.

In the fall of 2016, Ronald started to have episodes of dizziness and lightheadedness about once a day when he got up and out of bed. The episodes did not occur if Ronald sat or stood still, throughout the day, or when he swallowed liquids. On October 19, 2016, Ronald, who was accompanied by Mary, was seen by Nicole Gibbons, a nurse practitioner, and Spencer Nagle, an internal medical resident, at West Michigan Cardiology. At the appointment, Nagle physically examined Ronald and took a history. The progress report of the appointment indicated that Ronald received a pacemaker in 2002, but it made no mention of why the pacemaker was implanted. Nagle testified that it would have been good to know why Ronald had the pacemaker.

Gibbons testified that she requested an interrogation of Ronald's pacemaker in order to see how much Ronald "was pacing if he was pacing" and to see if Ronald had experienced any arrhythmias that could have contributed to his episodes. Gibbons received the Medtronic report of the interrogation which showed that Ronald had not experienced any arrhythmias and that the pacemaker's right ventricular lead was not being used to pace Ronald's heart. Gibbons was aware that the report showed an "elevated number" for impedance of the pacemaker's right ventricular lead. Gibbons attempted to determine whether Ronald's dizzy episodes were related to the impedance. In light of Ronald's report that the dizziness lasted minutes to hours, occurred when he moved his head, and that the medication Meclizine lessened his symptoms, Gibbons believed that Ronald's dizziness was caused by an inner ear problem and referred him to an ear, nose and throat specialist. She also instructed Ronald to stop taking his blood pressure medications and to follow up in six months. Gibbons did not place any restrictions on Ronald's driving because he did not report experiencing a syncopal episode.

Dr. Singh, a cardiologist employed by West Michigan Cardiology, did not personally treat Ronald when he was seen by Gibbons and Nagle. However, he signed off on the progress report of the appointment as prepared by Gibbons. From his review of the Medtronic report, Dr. Singh opined that Ronald's pacemaker was functioning normally, but acknowledged that the right ventricular lead was "borderline high." Nonetheless, Dr. Singh did not believe that it was unsafe for Ronald to drive.

In November 2016, Ronald drove his truck with Mary as his passenger. Ronald took a sip of coffee and then had a feeling similar to his prior experiences before passing out. Ronald drove the truck to the side of the road, but he was unable to stop it and crashed into a tree. Following the accident, Ronald was hospitalized and underwent a right ventricular lead revision. In January 2017, Dr. Singh signed a letter indicating that Ronald suffered a syncopal episode caused by "malfunction of his right ventricular lead of his previously placed pacemaker" while driving that

---

[2] Generally stated, swallow syncope is a loss of consciousness during or immediately after swallowing.

led to an automobile accident. The letter advised that the malfunction was corrected, and Ronald was able to resume driving without restrictions. Although Dr. Singh testified that he did not prepare the letter, he signed it.

In April 2019, plaintiffs sued defendants for medical malpractice. They alleged that Dr. Singh owed a duty to Ronald as well as Mary, as a foreseeable passenger in a motor vehicle driven by Ronald, to properly care for and treat Ronald. Plaintiffs alleged that Dr. Singh breached his duty of care when he failed to take a specific history from Ronald, to determine the pattern, frequency, and duration of his episodes, failed to determine whether there was a correlation between Ronald's episodes and the pacing of the right ventricular lead in the pacemaker, failed to implement a plan of care to repair or replace the right ventricular lead, and failed to restrict Ronald from driving a motor vehicle. Mary also sued defendants for ordinary negligence.

In November 2020, defendants moved for summary disposition under MCR 2.116(C)(10) as to Mary's claims, citing her lack of a physician-patient relationship with Dr. Singh. It was further submitted that the narrow exception to the rule that a physician has no duty to a third party was inapplicable. Defendants claimed it was not foreseeable that Ronald would have a syncopal episode while driving in November 2016 because he had not experienced any syncopal episodes between 2002 and November 2016. At the time of Ronald's October 2016 appointment, he did not report any episodes of passing out, and Ronald did not have any episodes of dizziness while driving. Additionally, although the interrogation of Ronald's pacemaker showed that there was a slight issue with the pacemaker, it did not indicate that Ronald was having arrhythmias, such that his pacemaker was regularly being used to steady his heart beat. Thus, defendants alleged that Ronald's complaints of dizziness were unrelated to his pacemaker.

Mary responded that there was a question of fact whether defendants should have foreseen that Ronald would experience a syncopal episode. According to plaintiffs' experts, the interrogation of Ronald's pacemaker showed that the right ventricular lead was not working properly. Given the symptoms that Ronald reported in October 2016, it was entirely foreseeable that Ronald would have a syncopal episode if his pacemaker was not functioning properly. It did not even appear that Dr. Singh knew why Ronald originally had the pacemaker implanted.

The trial court granted defendants' motion as to Mary's claim for negligence, but denied the motion as to Mary's claim for medical malpractice. It concluded a factual issue was presented for resolution by the jury in light of the prior diagnosis and the danger associated with driving. Accordingly, the trial court entered an order denying in part and granting in part defendants' motion for summary disposition. From this ruling, defendants appeal the order denying summary disposition of Mary's claim for medical malpractice.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition is reviewed de novo. *Houston v Mint Group, LLC*, 335 Mich App 545, 557; 968 NW2d 9 (2021). Summary disposition is appropriate pursuant to MCR 2.116(C)(10) where there is "no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary disposition challenged under MCR 2.116(C)(10), the appellate court considers the affidavits, pleadings, depositions,

-3-

admissions, and other admissible documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party. MCR 2.116(G)(4), (G)(5); *Buhl v City of Oak Park*, 507 Mich 236, 242; 968 NW2d 348 (2021).

## III. ANALYSIS

Defendants contend that the trial court erred in concluding that there was a question of fact regarding whether defendants owed a duty of care to Mary, as a third-party, because it presented a question of law, and it was not reasonably foreseeable that Ronald would suffer a swallow syncope episode while driving. We disagree.

"A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). In this context, the duty owed by the healthcare professional arises from the healthcare professional's relationship with the patient. *Roberts v Salmi*, 308 Mich App 605, 614; 866 NW2d 460 (2014). However, it does not follow that only a patient may bring a malpractice claim or that a physician never owes a duty to third parties. *Id*. at 615. To the contrary, "[c]ourts have recognized that a professional may be liable in malpractice to a third party for harms caused by his or her breach of the applicable standard of care notwithstanding the lack of a professional-client relationship with the third-party." *Id*.

To maintain a claim, a third party must establish that the physician owed a duty to the third party. See *id*. at 615-616. "Duty is actually a question of whether the defendant is under any obligation for the benefit of the particular plaintiff and concerns the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other." *Marcelletti v Bathani*, 198 Mich App 655, 663; 500 NW2d 124 (1993) (quotation marks and citation omitted). "[T]he ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty." *In re Certified Question from Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 505; 740 NW2d 206 (2007). Relevant considerations include the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. *Id*. "The most important factor to be considered is the relationship of the parties." *Id*.

> Generally, an individual has no duty to protect another who is endangered by a third person's conduct. The duty to protect others against harm from third persons is based on a relationship between the parties. A duty of reasonable care may arise where one stands in a special relationship with *either the victim or the person causing the injury*. The requisite special relationship must exist between the defendants and the victims or the defendants and the third parties. [*Marcelletti*, 198 Mich App at 664 (emphasis added; quotation marks and citation omitted).]

Among the special relationships specifically recognized in Michigan is the doctor-patient relationship. *Id*. The issue of duty generally presents a question of law for the trial court. See *Chelik v Capital Transp, LLC*, 313 Mich App 83, 89; 880 NW2d 350 (2015). "However, if there are factual circumstances that give rise to the duty, the existence of those facts must be determined by a jury." *Howe v Detroit Free Press, Inc*, 219 Mich App 150, 156; 555 NW2d 738 (1996), aff'd

457 Mich 871 (1998). "In such cases, summary disposition would not be proper, and the matter must be submitted to the jury for resolution, accompanied by an appropriate instruction regarding a defendant's duty conditioned upon the jury's resolution of the factual dispute." *Id*.

In *Duvall v Goldin*, 139 Mich App 342, 350-352; 362 NW2d 275 (1984),[3] this Court specifically considered whether a doctor owed a duty to third parties when treating an individual who, because of a medical condition, posed a danger to third parties when driving. The patient in *Duvall* suffered from epileptic seizures, and he suffered a seizure while driving, resulting in a car accident that injured the plaintiffs. *Id*. at 346-347. The plaintiffs filed suit against the doctor, claiming that the doctor breached a duty to "persons operating motor vehicles on the public highway," including the plaintiffs, by failing to properly treat the patient and by failing to instruct him not to operate a motor vehicle. *Id*. at 346. The trial court granted summary disposition to the defendant-doctor, concluding that the doctor owed no duty to third parties. *Id*.

This Court reversed the trial court's grant of summary disposition. First, the *Duvall* Court concluded that the doctor had "a special relationship with his patient, the so-called 'dangerous person', which [this Court believed was] sufficient to place this case within the exception to the common-law rule that no one has a duty to protect an individual who is endangered by the conduct of another." *Id*. at 350-351. Turning to the issue of foreseeability, this Court also determined that the risk of harm to third parties was reasonably foreseeable, explaining:

> Given the nature of the condition involved in the present case, epileptic seizures, and assuming as we must the truth of plaintiffs' allegations, we are of the opinion that it is foreseeable that a doctor's failure to diagnose or properly treat an epileptic condition may create a risk of harm to a third party. By statute, restrictions and limitations may be placed upon individuals seeking drivers' licenses because of a physical disability or disease which prevents that person from exercising reasonable control over his vehicle. Here, one of the alleged breaches of duty involves the defendant's failure to inform his patient not to operate a motor vehicle. The likelihood of injury to a third party due to an automobile accident arising from that breach is not so rare or unusual an occurrence as to be considered unforeseeable. Accordingly, we find that the trial court erred in granting summary judgment. [*Id*. at 352 (citations omitted).]

Although recognizing that such a duty may exist, the *Duvall* Court specified that its holding was intended to be narrow:

> [O]ur decision in this regard is limited to the narrow facts set forth in this case. We decline to find a duty in every instance involving a physician, his patient and an unidentifiable third party. We do not intend to make physicians highway accident insurers. Further, even though defendant may have failed to instruct [the patient]

[3] Although the *Duvall* decision was rendered before November 1, 1990, this Court's published decisions are considered precedent under MCR 7.215(C)(2) and the principles of stare decisis. See *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018). The precedential effect of a case should not be rejected "simply because it is an older case." *Id*.

not to drive, [the patient], too, may have been negligent in resuming driving without the express consent of his physician, or in otherwise failing to recognize the danger of driving without medication. This too is a question for the jury. [*Id*.]

In light of *Duvall*, the trial court did not err in denying defendants' motion for summary disposition of Mary's claim of medical malpractice. Although duty is generally a question of law for the trial court, the facts and circumstances of a special relationship may give rise to an issue for resolution by the jury. *Id*. Viewing the evidence in a light most favorable to plaintiffs, the evidence demonstrated that, in 2002, Ronald was diagnosed with swallow syncope, a condition that causes him to lose consciousness when swallowing. Considering the potential loss of consciousness, swallow syncope can be seen as a dangerous medical condition—akin to the epileptic seizures at issue in *Duvall*—that would prevent a patient from exercising reasonable control over his vehicle, making it foreseeable that failure to properly treat this condition or to warn the patient about the dangers of driving would create a risk of harm to a third party. See *id*. In other words, given the inherent and extreme danger posed by loss of consciousness while driving, Ronald's swallow syncope is the sort of dangerous condition that falls within the "narrow" scope of *Duvall*'s holding.

Ronald's condition was addressed in 2002 with the installation of a pacemaker, and he did not have a syncopal episode for 14 years. Plaintiffs' expert opined that Ronald's heartrate slowed considerably when he swallowed, meaning that Ronald's form of swallow syncope was "heart-rate-dependent" and that the pacemaker prevented him from losing consciousness. Absent a functioning pacemaker, Ronald could experience swallow syncope and the accompanying dangers that condition posed while driving.

In the fall of 2016, Ronald went to Dr. Singh's office, where he was treated by a nurse practitioner and a medical resident for dizziness, lightheadedness, and balance issues. Although not present for the appointment, Dr. Singh signed off on the paperwork, and he acknowledged that he was ultimately responsible for Ronald's treatment. Notably, at the appointment, Ronald's pacemaker was interrogated. Plaintiffs' expert concluded the results demonstrated that the pacemaker was *not* functioning properly, that Ronald was at risk of syncopal episodes, and that the standard of care required pacemaker repair or further diagnostic testing. In other words, given the impedance revealed when the pacemaker was interrogated, a special relationship can be found to exist because Dr. Singh knew, or pursuant to the standard of care, should have determined, that Ronald posed a serious threat to third parties on the road. Yet, despite the high impedance, no further testing of the pacemaker was ordered, no efforts were undertaken to repair the pacemaker, and Ronald was not warned that the abnormality with his pacemaker could result in syncopal episodes that would pose a danger while driving. Instead, Ronald was told that there was nothing to worry about and that he should come back in six months for a follow-up appointment. Then, in November 2016, Ronald lost consciousness while driving and crashed his vehicle into a tree, and his passenger, Mary, was injured as a result. Defendants' dispute regarding the pacemaker's efficiency and the propriety of the care received creates a factual issue for resolution by the jury. See *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013).

Given the conflicting evidence and expert opinions with regard to the significance of the right ventricular impedance in Ronald's pacemaker in October 2016, material questions of fact remain regarding whether Ronald constituted a dangerous person within the meaning of *Duvall*.

In these circumstances, the trial court did not err by failing to decide the duty question as a matter of law and by denying defendants' motion for summary disposition. See *Howe*, 219 Mich App at 156. The jury must determine whether Ronald constituted a "dangerous person" under *Duvall* in light of the competing testimony whether his pacemaker was functioning properly given the high impedance in the right ventricular lead.[4]

Affirmed.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ Sima G. Patel

---

[4] We decline to address defendants' argument regarding application of MCL 333.5139. The issue was not raised, addressed and decided in the trial court. This Court's function is to serve as an error-correcting Court. See *Apex Laboratories Int'l Inc v City of Detroit*, 331 Mich App 1, 10; 951 NW2d 45 (2020). Defendants did not characterize whether MCL 333.5139 granted immunity, whether the statute was an affirmative defense, and whether defendants' pleadings raised the affirmative defense. Because the trial court did not address the issue and in light of defendants' sparse briefing of the issue, we are not poised to address this claim.