*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EDWARD JAMES TYSON,

        Plaintiff-Appellant,

v

DAVID CLARENCE DAWKINS and UNTHANK, LLC, doing business as B.S. & CO.,

        Defendants-Appellees.

UNPUBLISHED
April 22, 2021

No. 346595
Cheboygan Circuit Court
LC No. 17-008628-NO

Before: BECKERING, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

In this interlocutory appeal, plaintiff Edward James Tyson appeals as on leave granted[1] the trial court's order granting summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) to defendant Unthank, LLC, doing business as a bar and takeout establishment called B.S. & Co, located in Wolverine, Michigan.[2] At issue on appeal is whether defendant owed any duty to plaintiff associated with his being twice assaulted by one of defendant's bar patrons just outside the bar's front door, which according to several witnesses was due to the color of plaintiff's skin. We reverse and remand for further proceedings.

## I. BACKGROUND

On Saturday, September 12, 2015, David Dawkins and a few friends went to defendant's bar for "bike night," which had been a regular, summertime Saturday evening event for motorcycle

---

[1] This Court initially denied plaintiff's application for leave to appeal. *Tyson v Dawkins*, unpublished order of the Court of Appeals, entered May 22, 2019 (Docket No. 346595). On December 11, 2019, our Supreme Court remanded the case to this Court for consideration as on leave granted. *Tyson v Dawkins*, 505 Mich 881 (2019).

[2] Defendant David Dawkins is not a participant in this appeal. "Defendant" as used in this opinion refers only to defendant Unthank, LLC, unless otherwise noted.

enthusiasts at defendant's bar for a couple of years.[3] Dawkins testified that he had been at the bar, which was pretty crowded, for about an hour and had "a few" or "a couple of different" mixed drinks by the time he encountered plaintiff. That evening, ABATE[4] was sponsoring a live band at the park across the street from the bar. Dawkins testified that "you leave your drink sitting at the bar and then you go outside" to listen to the band. Plus, because it's bike night, everybody goes there to "talk and bull***t and look at bikes." Dawkins also testified that "everybody goes out and smokes." While he does not smoke, he was standing outside with other patrons when plaintiff approached the bar.

Plaintiff testified that at approximately 9:30 p.m., he was walking to the bar with his friend, Steven Leslie, in order to pick up a takeout food order.[5] As plaintiff was approaching the bar, he heard two people standing by the bar near other bikers making racially charged remarks at his expense, repeatedly using the word "n[***]er." When he reached the bar, he talked to the two people, "April and Josh," and expressed his offense at the word and defended his character.[6] Afterward, he turned to walk into the bar when "some old dude," being Dawkins, stepped in front of him and said, "Well, you're a n[***]er to me" and took a fighting stance. Plaintiff backed up toward the curb, trying to avoid a fight, looked at Leslie for what to do next, and that's when Dawkins struck him. Plaintiff remembered nothing else about the evening.[7] Leslie similarly testified that when he and plaintiff approached the bar to pick up a pizza, a woman called plaintiff a racial slur. Plaintiff and Leslie had crossed the street and were "right in front of the bar door" as plaintiff prepared to walk in and get his pizza.[8] While plaintiff was defending himself to the person who had made the racial slur, Leslie heard Dawkins call defendant the same racial slur. Dawkins stepped in front of plaintiff, at which point words were exchanged between the two, and Dawkins

---

[3] The factual summary is based on the deposition testimony and other documents that were filed in the trial court in association with defendant's summary disposition motion.

[4] According to various witnesses, ABATE is a motorcycle organization that hosts an event in Wolverine around 9/11 each year and advocates against the bike helmet laws, among other issues.

[5] Plaintiff's girlfriend called the bar to place the food order. Dawkins testified that B.S. & Co. is the only restaurant and bar in town. Karla Ford, who was working in the bar's kitchen, testified that plaintiff had picked up his girlfriend's food orders in the past, as due to a prior incident she was no longer welcome at the bar.

[6] The record evidence shows that plaintiff was referring to April Wilson and Josh Ogden. Interestingly, two years after this racially charged incident, which witnesses attribute to being instigated by April, she was hired as an employee of defendant bar.

[7] Plaintiff testified that his first memory following the initial attack was being awoken by a call from the police at approximately 10:00 a.m. Sunday morning. By that evening, he was experiencing difficulty standing up, causing him to seek emergency medical treatment.

[8] Testimony as to the factual events of the evening vary from witness to witness, sometimes substantially, but a resolution of these discrepancies would be a matter for the jury. Our responsibility is to view the evidence in the light most favorable to plaintiff, and our scaled down version of the facts is focused accordingly.

"hauled off and punched" plaintiff, knocking him off his feet and out cold, and causing his head to "bounce[] on the concrete" sidewalk. Just prior to the encounter, Dawkins had been standing by a window outside the bar where there is a ledge that "everybody leans on when they're out there smoking cigarettes." According to Leslie, Dawkins then proceeded to confront Leslie as to why he would bring a "n[***er]" to the bar. Meanwhile, plaintiff did not regain consciousness for at least a minute.

Dawkins testified that plaintiff had approached him outside the bar, asked Dawkins if he had called plaintiff a racial slur, postured for a fight, and Dawkins punched plaintiff in the jaw in self-defense, causing plaintiff to stumble and fall to the ground.

Ian Graham, who was employed as a bartender for defendant at the time, testified that he was sitting at the bar drinking a beer and dividing his tips after his shift had ended when someone entered the bar and said that an "N-Word" just got knocked out.[9] Graham testified that he knew it was plaintiff because "we only have one colored in our town." He walked out of the bar and found plaintiff, whose body was halfway on the sidewalk and halfway in the street. Plaintiff was bleeding and spitting blood from his mouth—indicating that by the time Graham stepped outside, plaintiff had regained consciousness. Graham testified that Dawkins had gone back inside the bar by the time he got outside, as plaintiff was asking, "Where's Dave? Where's Dave[?]"[10] Graham testified that Dawkins has a reputation for being a racist and "talked bad about the colored all the time."

Graham testified that he picked plaintiff up from the ground, asked him what happened, and moved him toward the front door of the bar. Leslie told Graham that Dawkins had called plaintiff a racial slur and hit him. Graham testified that someone in the crowd apparently interpreted plaintiff's inquiries as to Dawkins' whereabouts as an indication that he wanted to continue the fight, so the person went into the bar to find and inform Dawkins. According to Graham, approximately three to five minutes later, Dawkins came back out of the bar and again confronted plaintiff. Plaintiff demanded that Dawkins stop calling him racial slurs. Dawkins proceeded to strike plaintiff three more times, knocking him to the ground on each occasion as plaintiff demanded that he not be called a racial slur, and ending with Dawkins' last punch causing plaintiff to fall into nearby motorcycles. Graham described this series of punches as lasting "three minutes or so." Plaintiff never struck back, he just kept asking "why are you calling me that?" When Graham proclaimed that things were getting out of hand, Dawkins became confrontational with him as well, "chest bumping" Graham and threatening to "beat [him] down."

The bar's night-shift manager, Heather Jones, testified that two customers entered the bar and told her that Dawkins had just punched plaintiff out on the sidewalk. Jones testified that she went into the kitchen to tell the cook, Karla Ford, what had happened, and to ask Ford to watch the bar so she could call the police, as she was not allowed to leave the bar unattended. However,

---

[9] By all accounts the bar was very busy due to it being "bike night" with ABATE's annual party in the park nearby, so it is not clear why Graham's bartending shift ended at 9:00 p.m., leaving only a kitchen worker making pizzas and a night shift manager left to tend bar.

[10] Dawkins and Leslie testified that Dawkins did not go inside after the initial punch; rather, he remained nearby.

both Ford and Jones testified that there is a telephone at the bar. Jones claimed that by the time she returned from the kitchen, plaintiff had entered the bar to pick up his food. According to Jones, she offered to call police, but plaintiff declined. He picked up his food and left. Despite Graham's description of plaintiff's bloody mouth, and then swollen face after round two—which Graham had asked plaintiff to clean up before going into the bar and plaintiff declined—Jones did not notice anything amiss with plaintiff's appearance. As already noted, plaintiff testified that he was knocked unconscious when Dawkins hit him the first time and he did not remember entering the bar to pick up his food. Meanwhile, Dawkins testified that after the second series of punches, he sat back down at one end of the bar and watched plaintiff head to the other end of the bar to pick up his food, lodge insults and threats, and leave.

Dawkins testified that he stayed at the bar for approximately 30 minutes after the assault. He testified that he was not told to leave the bar, even though "everybody" was talking about the fight and he was defending his conduct. Rather, according to Dawkins, Jones refused to serve him any more alcohol because he was involved in the fight. In contrast, Graham testified that he told Dawkins to leave at the request of Jones because she was scared. Graham testified that he told Dawkins, "Dave, you've got to leave, everybody wants you to leave, the police are coming, that's when he started chest bumping me again and muscling me down." According to Graham, Dawkins then "pounded his drink and left; or went out onto the sidewalk. I don't know what happened after that." It is undisputed that no one called the police that evening. Dawkins testified that after he left the bar, he went to the park with his friends and listened to live music for an hour or two. As a result of the incidents, plaintiff suffered frontal lobe brain damage and bleeding on the brain. Dawkins was later arrested and pleaded guilty[11] to aggravated assault.

Plaintiff filed the instant suit against both Dawkins and B.S. & Co. The trial court granted summary disposition in favor of B.S. & Co., concluding that it owed no duty to plaintiff because the altercation did not occur on premises owned by the bar. It also denied plaintiff's motion for reconsideration. This interlocutory appeal followed.

## II. STANDARD OF REVIEW

This Court reviews de novo motions for summary disposition under MCR 2.116(C)(10). *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). This Court's review is "limited to the evidence that had been presented to the circuit court at the time the motion was decided." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009).

Summary disposition is appropriate under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Bennett v Russell*, 322 Mich App 638, 642; 913 NW2d 364 (2018) (quotation marks and citation omitted).

---

[11] Dawkins testified that he pleaded no contest, however, his judgment of sentence indicates that he pleaded guilty.

In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. [*Quinto v Cross and Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996) (citations omitted).]

Whether a defendant owes a legal duty to plaintiff is a question of law. *Roberts v Salmi*, 308 Mich App 605, 613; 866 NW2d 460 (2014). Whether a defendant has breached its duty is generally a question of fact for the jury. *Boumelhem v Bic Corp*, 211 Mich App 175, 181; 535 NW2d 574 (1995).

## III. ANALYSIS

Plaintiff argues that the trial court erred in concluding that because Dawkins assaulted plaintiff on the sidewalk outside the bar, defendant owed him no duty. Based on the record evidence, we agree that the trial court erred.

To establish a claim of negligence, a plaintiff must prove that "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012) (quotation marks and citation omitted). A defendant cannot be liable for negligence unless he or she owed a legal duty. *Id*.

The general rule is that merchants have no obligation to anticipate and prevent criminal attacks against invitees. *MacDonald v PKT, Inc*, 464 Mich 334, 338; 628 NW2d 33 (2001). However, merchants do "have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." *Id.* at 338 (citation omitted). "Whether an invitee is readily identifiable as being foreseeably endangered is a question for the factfinder if reasonable minds could differ on this point. *Id*. "The duty is triggered by specific acts occurring on the premises that pose a risk of imminent and foreseeable harm to an identifiable invitee." *Id*. In *MacDonald*, our Supreme Court held:

A premises owner's duty is limited to responding reasonably to situations occurring on the premises because, as a matter of public policy, we should not expect invitors to assume that others will disobey the law. A merchant can assume that patrons will obey the criminal law. This assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee. It is only a present situation on the premises, not any past incidents, that creates a duty to respond. [*Id*. at 335 (citations omitted).]

Once the duty is triggered, a merchant must "reasonably expedite the involvement of the police," but a merchant is "not required to provide security guards or otherwise resort to self-help in order to deter or quell such occurrences." *Id*.

In the present case, the deposition testimony established that Dawkins was defendant's regular bar patron[12] who had temporarily left his drink on the bar with the intention of returning and was congregating along with other patrons in front of the bar who were doing the same thing. His testimony made it apparent that standing in front of the bar on the sidewalk was a common occurrence by defendant's patrons, whether their purpose was to smoke a cigarette, check out the motorcycles on "bike night," or listen to music emanating from the park for a bit before stepping back into the bar and returning to their drinks. Meanwhile, plaintiff was attempting to enter the bar to pick up a takeout food order when he encountered several of defendant's bar patrons just outside the entrance, including Dawkins. Viewed in the light most favorable to plaintiff, Dawkins prevented plaintiff from stepping inside the bar to get his food, and instead, called him a racial slur, caused him to back away from the door and toward the curb, and then punched him in the jaw so hard that it knocked plaintiff unconscious. Also viewed in the light most favorable to plaintiff, it was then that Dawkins returned to the bar and "everybody" started talking about what happened, with one patron entering the bar to pronounce that an "N-Word" had just gotten knocked out and two patrons specifically informing the night shift manager at the bar that Dawkins had punched plaintiff due to racial motivations first instigated by April. At that moment, a reasonable person would recognize a risk of imminent harm to plaintiff, an identifiable invitee, as Dawkins and plaintiff were still present at the scene. See *id*. at 335. And the need to expedite the involvement of the police was further enhanced by the racial overtones known by all and shared by several patrons. Because ABATE was having a party in the park nearby, it is not yet known how quickly police would have arrived, but the question before us is the existence of a duty, and we conclude that an employee or agent of defendant bar owed plaintiff a duty to summon the police after the first knockout punch.[13]

In sum, viewing the evidence in the light most favorable to the nonmoving party, *Bennett*, 322 Mich App at 642, after Dawkins called plaintiff a racial slur, punched him in the face just outside the front entrance, and reentered the bar, while another patron entered the bar and announced that an "N-Word" had been knocked out, we conclude that there arose a risk of imminent harm that the physical altercation would continue, especially considering the parties' ongoing argument and the involvement of bystanders. *MacDonald*, 464 Mich at 335. Thus, contrary to the trial court, we conclude that this incident triggered a duty by the defendant to reasonably expedite the involvement of the police. *Id*.

As for the location of the assault, simply because plaintiff had not made it through the threshold of the front door when he was knocked out by a bar patron does not mean he was not an

---

[12] Jones testified that Dawkins was a regular "bike night" customer, and thus, he came to the bar once a week.

[13] A jury might also conclude that had Dawkins learned that the police were called after the first assault, he would not have felt emboldened to engage in the second assault.

invitee or that defendant did not owe him a duty to reasonably respond once any employee or agent learned he had been knocked out. A reasonable jury could conclude that because defendant's bar patrons congregated out front on the sidewalk on bike nights and flowed in and out of the bar on a regular basis while temporarily leaving their drinks at the bar, the area around the front entrance was effectively defendant's premises.[14] While no caselaw addresses the exact circumstances at issue in this case, several are instructive. In *Schneider v Nectarine Ballroom, Inc (On Remand)*, 204 Mich App 1, 3-4; 514 NW2d 486 (1994), a physical altercation occurred inside the defendant's bar. A bouncer first removed the other participants in the fight and then pushed the plaintiff out the door. *Id*. at 3-4. As soon as the plaintiff was outside, one of the men who was previously ejected from the bar dragged the plaintiff toward a curb where he was beaten by two men. *Id*. at 4. The trial court granted the defendant's motion for summary disposition, concluding that the defendant did not owe the plaintiff a duty with regard to any injuries sustained off the premises. *Id*. at 5. This Court reversed, concluding that "accepting [the] plaintiff's allegations as true, the injuries he sustained should have been reasonably foreseeable to [the] defendant and the situation could have been easily avoided without much difficulty." *Id*. at 6-7. This Court further explained that "[i]f [the] plaintiff can prove his injuries, even though inflicted off the premises, were not only foreseeable but a direct result of the breach, liability should attach." *Id*. at 7. This Court agreed with the plaintiff that the defendant breached its duty to the plaintiff when its employee ejected the plaintiff into an obvious and imminently dangerous situation. *Id*.

Additionally, courts in other jurisdictions have similarly held that bar owners cannot avoid liability simply because the plaintiff's injuries occur outside the front door. See *Shortall v Hawkeye's Bar and Grill*, 283 Ill App 3d 439, 444; 670 NE2d 768 (1996) (reversing the trial court's order granting summary judgment in favor of the defendant bar owner in regard to the element of duty because the dispute at issue began in the bar, a challenge was made "to 'take it outside,' and a brawl developed just outside the front door and continued for 15 minutes while" bar employees watched out the window). See also *Regan v Denbar, Inc*, 514 NW3d 751, 753 (Iowa, 1994) (holding that there was sufficient evidence to avoid a directed verdict in a situation in which an altercation started inside the bar and continued outside); *Cassanello v Luddy*, 302 NJ Super 267, 273; 695 A2d 325 (App Div, 1997) (concluding that the fact that the final attack occurred 60 feet from the tavern was not dispositive in regard to whether the tavern owed a duty to the plaintiff); *Christopher v Father's Huddle Cafe, Inc*, 57 Mass App 217, 224; 782 NE2d 517 (2003) (holding that "the duty to protect patrons extends to all reasonably foreseeable harm including, in some circumstances, harm that occurs at a distance from the premises"). Moreover, in *Osborne v Stages Music Hall, Inc*, 312 Ill App 3d 141, 148; 726 NE2d 728 (2000), the court declined to hold that the bar owner's "duty to its patrons stopped at the door of the premises, especially where [the bar] used the sidewalk to control entry by customers." The court summarized that "the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men." *Id*. at 149. Although cases from other jurisdictions are not binding

---

[14] Accommodations made for outdoor dining in the face of Covid-19 have made it all the more apparent that a restaurant or bar can constructively possess and control the premises outside their establishment even though the land may be owned by the city or township.

precedent, we may consider such cases to the extent that we find their reasoning persuasive. *Hiner V Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006).

In this case, Leslie testified that when the altercation started, Dawkins was standing against a window ledge "that everybody leans on when they're out there smoking cigarettes." Dawkins' own testimony shows he was a bar patron who had momentarily stepped outside to join a group of other bar patrons in order to listen to live music playing nearby while their drink remained inside, awaiting their return. As noted, it could be implied from his testimony and others that this was a regular occurrence on Saturday night "bike night." Considering the evidence in the light most favorable to plaintiff, reasonable minds could conclude that the sidewalk where plaintiff suffered his injuries was used frequently by bar patrons to enter and exit the bar, congregate by the motorcycles parked out front, to smoke, and on this night, to listen to live music in the park associated with bike night. Moreover, once bar staff was aware that a physical altercation involving one of its patrons was occurring outside the bar and that the participants remained within the bar's proximity, it was reasonably foreseeable that, without intervention, the altercation would continue either inside or outside the bar. *MacDonald*, 464 Mich at 335; *Schneider (On Remand)*, 204 Mich App at 6-7.

Although plaintiff also asserts that defendant owed him a duty to warn arising out of premises liability law, we conclude that such a cause of action is inapplicable here. "Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land." *Lymon v Freedland*, 314 Mich App 746, 756; 887 NW2d 456 (2016) (quotation marks and citation omitted). This Court has explained that "[o]rdinary negligence claims are grounded on the underlying premise that a person has a duty to conform his or her conduct to an applicable standard of care when undertaking an activity." In this instance, defendant was acting as a merchant and generating revenue from its invitees, owing a duty as earlier described. *Id*. On the other hand, in a claim involving premises liability, "liability emanates merely from the defendant's duty as an owner, possessor, or occupier of land." *Id*. [A] landowner owes a duty to use reasonable care to protect invitees from unreasonable risks of harm posed by dangerous conditions on the owner's land." *Id*. at 757 (quotation marks and citation omitted).

In this case, plaintiff appears to suggest that defendant had a duty to protect plaintiff from Dawkins because Dawkins was a known, violent racist. However, Dawkins cannot reasonably be considered a dangerous condition on the land as that phrase is intended. *Id*. Considering the allegations and evidence presented in this case, plaintiff's claim arises from ordinary negligence and not premises liability. *Id*. at 756.

Plaintiff also contends that the trial court erred by finding there was no genuine issue of fact regarding whether Graham was on or off duty at the time of the assault. As explained earlier in this opinion, defendant owed a duty to protect plaintiff from imminent, foreseeable harm by calling the police after Dawkins first knocked out plaintiff and then remained at the bar. *MacDonald*, 464 Mich at 335. There is no dispute that Jones and a cook were working at the time of the assault and that they learned about the incident at the time but did not call the police. As a result, Graham's working status does not establish or preclude defendant's duty under the circumstances of this case. In any event, we agree that a jury could conclude that Graham

undertook to act as his employer's agent when he attended to the unfolding events as they occurred and later acted upon Jones' request to eventually tell Dawkins he had to leave the bar.[15]

[15] Second Restatement of Agency, 2d, § 228, p 504, provides the following general guidance for determining when conduct is within the scope of employment:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

The temporal and spatial components of the scope of employment set forth above in (1)(b) are further articulated in Restatement, §§ 233–234, pp 516–523. These sections provide that an employee's act is within the course of employment only if it is done "within a period which has a reasonable connection with the authorized period[,]" § 233, and "in the authorized area or in a locality not unreasonably distant from it[.]" § 234. Regarding the temporal component, comments to § 233 note:

> The employment exists only during the time when the servant is performing or should be performing the work which he is employed to do.... When it begins and terminates is determined by the terms of the employment and all the facts of the situation.... In determining whether the act is within the period of service, the fact that the act is upon the premises or that the instrumentality is the employer's is of importance, provided the act itself is one which might be proper if done within the working time. [Restatement, § 233, comment a, p 516 (emphasis added).]

Further, acts during a "forbidden time" are not necessarily outside the scope of employment. *Id*. at comment b, p 517. "There is a fringe of time within which the employment may continue. The extent of this is a matter of degree, depending upon all the factors—the place, purpose, kind of act, whose instrumentality is used, and the extent of departure from the normal time for performance." *Id*. (emphasis added).

These provisions of the Restatement make clear that whether an employee is "on the clock" is, alone, not determinative of whether the employee's actions fall within the scope of employment. Likewise, in the related context of immunity under the Governmental Tort Liability Act, MCL 691.1401 et seq., this Court has identified the "temporal and spatial boundaries" created by an employment relationship as only one factor that is relevant to determining if a government agent was acting within the scope or course of employment. *Niederhouse v Palmerton*, 300 Mich App 625, 633; 836 NW2d 176 (2013). As explained in *Niederhouse*, 300 Mich App at 635, the employer

Finally, defendant argued that it was also entitled to summary disposition pursuant to MCR 2.116(C)(10) in regard to the element of proximate cause. Because the trial court granted the motion in regard to duty, it did not address the proximate cause issue. Further, the parties do not address this issue in their appellate briefs. See *Tingley v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004) (stating that this Court does not ordinarily address issues not raised on appeal, or issues that were not decided by the trial court). As a result, we decline to consider any other elements of plaintiff's negligence claim.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Douglas B. Shapiro

---

need not specifically direct an off-duty employee to act in order for the employee's actions to be within the course of his or her employment. Under the circumstances present in the matter before us, we agree that a reasonable jury could conclude that Graham was acting as an agent of B.S. & Co. when he attended to the unfolding events and that he should have expedited the summoning of the police in order to protect plaintiff and dissuade Dawkins or others from further assaultive behavior after learning of the first assault.