*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GEN-WEALTH, INC., doing business as
GENERATIONAL WEALTH MANAGEMENT,

UNPUBLISHED
May 13, 2021

Plaintiff-Appellant/Cross-Appellee,

v

BRIAN A. FRECKMAN and KORHORN
FINANCIAL GROUP, INC.,

No. 353584
Ottawa Circuit Court
LC No. 17-005157-CB

Defendants-Appellees/Cross-
Appellants.

Before: K. F. KELLY, P.J., and SERVITTO and LETICA, JJ.

PER CURIAM.

In this posttermination dispute, plaintiff, Gen-Wealth, Inc. (Gen-Wealth), which does business as Generational Wealth Management, appeals by right the trial court's order dismissing its claims against defendants, Brian A. Freckman and Korhorn Financial Group, Inc. (Korhorn Financial). Gen-Wealth also appeals by right the trial court's order resolving a dispute over spoliation of evidence. On cross-appeal, Freckman and Korhorn Financial each appeal the trial court's order awarding them only part of their attorney fees as an offer-of-judgment sanction.[1] We affirm both orders.

## I. BASIC FACTS

Gen-Wealth offered investment advice and served as a financial representative for its clients. Brian Wilson managed Gen-Wealth, which he operated out of Zeeland, Michigan. Freckman had previously worked for Korhorn Financial, which was owned by Kevin Korhorn, but moved to Gen-Wealth in June 2009. Wilson fired Freckman in September 2017.

---

[1] The order awarding Freckman and Korhorn Financial the offer-of-judgment sanctions is the same order resolving Gen-Wealth's dispute of the spoliation of evidence.

-1-

During Freckman's employment with Gen-Wealth, Freckman executed an agreement in which he agreed to keep certain matters confidential and to refrain from engaging in competition with Gen-Wealth for two years within 20 miles of Zeeland. Freckman also agreed that he would not solicit Gen-Wealth's clients for two years.

Freckman sought employment with Korhorn Financial as a financial advisor after he left Gen-Wealth. Evidence showed that he contacted Korhorn Financial and posted messages on social media in which he suggested that he might eventually open a practice in Zeeland, Michigan. However, the evidence also showed that Freckman moved to Indiana and began advising Korhorn Financial's existing clients out of Korhorn Financial's office in Granger, Indiana.

Gen-Wealth suspected that Freckman might be violating the agreement governing confidential information, competition, and solicitation. Accordingly, it sued Freckman in November 2017. It alleged various claims: misappropriation of trade secrets (Count I), common-law and statutory conversion (Counts II and III), replevin (Count IV), breach of fiduciary duty (Count V), tortious interference with business relations (Count VI), and unjust enrichment (Count VII). In March 2018, Gen-Wealth filed an amended complaint, naming Korhorn Financial as a defendant and alleging that Korhorn Financial participated in the same torts alleged against Freckman, except for the breach of fiduciary duty claim.

After contentious discovery, each party moved for summary disposition. Each party argued that there was no dispute about the underlying facts and stated that summary disposition was appropriate. Gen-Wealth further argued that the trial court should enter judgment in its favor because discovery revealed that Freckman and Korhorn Financial had destroyed the hard drive from the original laptop that Korhorn Financial had provided to Freckman. The spoliation of evidence, Gen-Wealth argued, warranted entry of judgment in its favor.

The trial court entered its opinion and order denying Gen-Wealth's motion for summary disposition and granting the competing summary disposition motions of Korhorn Financial and Freckman. The trial court first rejected the contention that the spoliation of evidence warranted an extreme sanction because the hard drive at issue had been fully copied and transferred to the hard drive that Gen-Wealth examined. The court found that the only evidence that may have been lost were nonuser-created files that were maintained by the operating system and that there was no evidence that the hard drive was intentionally replaced to destroy evidence. Nevertheless, the court concluded that some sanction would be appropriate.

After summarizing the evidence, the trial court ruled on the summary disposition motions. The court first determined that, as a matter of law, assets under management, the number of clients, customer lists, and the term "consolidated client" did not constitute trade secrets under the Michigan Uniform Trade Secrets Act, MCL 445.1901 *et seq*. Therefore, Gen-Wealth failed to establish a question of fact for trial on Count I.

As for the conversion counts (Counts II and III), the trial court stated that—even assuming that digital information can constitute property capable of being converted—Gen-Wealth had not identified any evidence that it suffered damages. Instead, Gen-Wealth merely speculated that some clients may have moved their assets to banks. The court concluded that such speculation was insufficient to survive a motion for summary disposition and dismissed Counts II and III. The trial

court similarly concluded that replevin applied to tangible personal property, so it could not apply to the information at issue. For that reason, it dismissed Count IV.

The trial court also rejected Gen-Wealth's contention that it had a viable claim that Freckman breached his fiduciary duty. The court concluded that Freckman did not owe Gen-Wealth a fiduciary duty after his termination and, in any event, Gen-Wealth failed to come forth with any evidence that Freckman breached a fiduciary duty. Accordingly, it denied Gen-Wealth's motion and granted Freckman's motion for summary disposition as to Count V.

As for the claims of tortious interference with a business relationship (Count VI) and unjust enrichment (Count VII), the trial court determined that Gen-Wealth failed to show that Freckman or Korhorn Financial had been unjustly enriched and failed to establish a question of fact as to damages. For that reason, it dismissed both claims, resulting in the dismissal of all Gen-Wealth's claims.

Gen-Wealth then filed a motion for $56,329.30 in sanctions arising from the spoliation of evidence, and a motion for reconsideration of the trial court's opinion and order dismissing its claims. Thereafter, Korhorn Financial moved for $32,181.19 in costs and attorney fees as an offer-of-judgment sanction. Freckman similarly moved for $19,872.56 in offer-of-judgment sanctions.

The trial court entered its opinion and order resolving the motion for reconsideration and the motions for sanctions. The court first denied the motion for reconsideration because Gen-Wealth only argued matters that had already been expressly or impliedly ruled on in the earlier order.

The trial court next addressed Gen-Wealth's motion for spoliation sanctions. It determined that the only evidence that was lost by the destruction of the hard drive was nonuser-generated files. It also found that the loss of the hard drive was not done with the intent to destroy evidence. The court similarly concluded that there was no evidence that the lost electronic information was material or relevant. Under the circumstances, the trial court concluded that it would not be appropriate to sanction Freckman and Korhorn Financial. Nevertheless, the trial court examined Gen-Wealth's request for attorney fees and concluded that Gen-Wealth's request was far in excess of what was reasonably associated with the spoliation. It determined that $10,777.50 in attorney fees, $20.60 in costs, and $843.75 in expert costs would be a reasonable "potential award."

Finally, the trial court examined the request for offer-of-judgment sanctions by Freckman and Korhorn Financial. The court determined that Freckman had established that his reasonable costs and attorney fees were $18,186.56. But the court also determined that it would be in the "interests of justice" to adjust the fee by a portion of the reasonable attorney fees that Gen-Wealth incurred as a result of Freckman's "inadvertent spoliation of potential evidence . . . ." Accordingly, the trial court adjusted the award to $12,365.63. The court determined that Korhorn Financial had reasonable costs and attorney fees of $29,456.19, which it stated should be adjusted down for the inadvertent spoliation. It reduced the award to $23,635.26.

The parties then appealed and cross-appealed in this Court.

## II. COMPLIANCE WITH COURT RULES

Freckman and Korhorn Financial assert that Gen-Wealth's brief on appeal does not comply with the court rules concerning the requirements of appellate briefs. Specifically, they argue that Gen-Wealth's brief does not reference the specific pages of documents that were filed with the trial court, the statement of the questions presented are not sufficiently detailed, and there is no appendix attached. For these reasons, Freckman and Korhorn Financial request this Court to dismiss Gen-Wealth's appeal.

We agree with the assertions that Gen-Wealth's brief is deficient in multiple regards. As noted, Gen-Wealth's brief on appeal rarely contains citations "with specific page references" to documents filed with the trial court. MCR 7.212(C)(6). Indeed, Gen-Wealth sporadically cited only to exhibits (with only a select few citing to page numbers) that it attached on appeal. "Such general citations are insufficient. . . . We will not search the record for factual support for plaintiff['s] claims." *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 388; 689 NW2d 145 (2004).

Furthermore, Gen-Wealth's brief on appeal fails to present "[a]ll material facts, both favorable and unfavorable, . . . without argument or bias." MCR 7.212(C)(6). For example, Gen-Wealth has related that Freckman admitted that he printed hundreds of pages of confidential reports for which he did not account. While Freckman did admit that he ran the confidential reports, he never admitted that he printed the reports. Even if Freckman had admitted to printing the reports, he accounted for the printed materials by testifying that he did not retain any printed materials because he either returned the materials or shredded them. Additionally, as discussed below, Gen-Wealth distorts the underlying facts concerning the spoliation issue by representing that evidence *was lost*, while the affidavits submitted by the experts only state that evidence *may have been lost*.

This Court could consider Gen-Wealth's issues abandoned on the basis of its noncompliance with MCR 7.212. *Waterford Sand and Gravel Co v Oakland Disposal, Inc*, 194 Mich App 571, 572; 487 NW2d 511 (1992). Despite Gen-Wealth's failure to comply with the court rules, we decline to consider the issues abandoned and will address the merits.

## III. SPOLIATION OF EVIDENCE

Gen-Wealth claims that the trial court erred when it chose not to impose a severe sanction for the loss of the hard drive. Specifically, it argues that the trial court should have granted judgment in its favor as a sanction for the spoliation. At the very least, Gen-Wealth maintains, the trial court should have declined to award offer-of-judgment sanctions under the interest-of-justice exception as a sanction for spoliation of evidence. On cross-appeal, both Freckman and Korhorn Financial argue that the trial court erred when it reduced their award of actual costs under the offer-of-judgment rule equal to the reasonable costs and fees incurred by Gen-Wealth investigating and litigating the spoliation issue. We disagree with all the parties' arguments, and affirm the trial court's imposition of sanctions and the amount of the sanctions.

## A. STANDARDS OF REVIEW

"This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules." *Franks v Franks*, 330 Mich App 69, 86; 944 NW2d 388 (2019).

The factual findings underlying the trial court's application of the law are reviewed for clear error. *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 387; 761 NW2d 353 (2008). A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court made a mistake. *Id*.

This Court reviews for an abuse of discretion a trial court's decision whether to sanction a party for spoliation of evidence. See *Bloemendaal v Town & Country Sports Ctr, Inc*, 255 Mich App 207, 211; 659 NW2d 684 (2002). This Court also reviews for an abuse of discretion a trial court's decision whether to refuse an award of actual costs under the "interest of justice" exception in MCR 2.405(D)(3). *Derderian*, 263 Mich App at 374. A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 153-154; 908 NW2d 319 (2017).

## B. SPOLIATION SANCTIONS

There was evidence that Korhorn Financial failed to preserve the hard drive that was in the first laptop provided for Freckman's use after he began working for Korhorn Financial. Freckman testified that the laptop "died" and that he reported the problem to the persons who handle information technology at Korhorn Financial. Daniel Davis, who was the technology operations manager for Korhorn Financial, averred that the hard drive was examined and found to be prone to failure.[2] Nevertheless, Davis stated, the information-technology staff was able to copy the hard drive onto another drive, the copy was then transferred to a new laptop that was given to Freckman. Davis averred that all the user-created files and all the metadata from the original drive was copied over to Freckman's new drive, which was submitted to Gen-Wealth for investigation. After making the copy, the information-technology staff destroyed the original hard drive.

The trial court heard evidence about the spoliation issue and specifically found that Freckman and Korhorn Financial did not act with the intent to cause evidence to be destroyed. The evidence did not suggest that Korhorn Financial or Freckman deliberately caused the hard drive to be destroyed in order to suppress evidence. Rather, the evidence showed that Freckman simply informed the appropriate persons that he was having problems with the hard drive and those persons proceeded to handle the problem in the fashion that they were accustomed to perform. To be sure, Korhorn Financial and Freckman had a duty to take reasonable steps to preserve evidence that they knew or should have known was relevant. See *Bloemendaal*, 255 Mich App at 211. As such, had they known that reporting the defective hard drive would result in the loss of the physical drive, which in turn might have caused the loss of evidence, they might be said to have breached their duty by failing to take reasonable steps to ensure that the information-technology persons addressing Freckman's concerns about the drive preserved the hardware. See *id*. But, considering the totality of the evidence, the trial court's finding was not clearly erroneous. See *Johnson Family Ltd Partnership*, 281 Mich App at 387.

---

[2] Although Gen-Wealth highlights the different testimony as to why the hard drive was copied, we concur with the trial court's finding that "Freckman's deposition description of the hard drive as having 'crashed' is . . . not a misrepresentation of the facts, but merely a lay description of the circumstances."

After determining that the loss of the hard drive was not intentionally done to destroy evidence, the trial court still felt that it would be appropriate to fashion some sanction. And the trial court had the inherent authority to sanction a party for failing to preserve evidence that it knew or should have known might be relevant. See *Bloemendaal*, 255 Mich App at 211. The purpose of the power is to protect the integrity of the judicial system. *Brenner v Kolk*, 226 Mich App 149, 160; 573 NW2d 65 (1997). The power is broad: a trial court can craft a sanction that ranges from an appropriate jury instruction to the extreme sanction of dismissal. *Id*. at 163-164. When considering an appropriate sanction, the trial court must carefully fashion the sanction to ensure that it is appropriate under the totality of the circumstances. *Id*. at 161.

On these facts, the loss of the hard drive would not warrant an extreme sanction. The undisputed evidence showed that the information-technology persons who handled the drive preserved all the user-generated files and associated metadata from Freckman's original hard drive. Gen-Wealth's own expert only opined that it was *possible* that some of the system artifacts and files were not transferred. As such, the trial court did not err when it found that the hard drive's loss did not result in the destruction of evidence that was material or relevant. The record showed that the relevant files and data had been transferred from the original hard drive to the hard drive that was on the laptop submitted for Gen-Wealth's examination. Although there was evidence that the original hard drive theoretically could have contained artifacts in the form of data generated by the operating system that were not copied to the interim hard drive or the hard drive submitted for expert review, there was no evidence that the artifacts were relevant and material evidence.

Notably, Gen-Wealth had the benefit of an examination of the computer that Freckman used at Gen-Wealth and an examination of Freckman's personal computer. Those examinations demonstrated the limited value of system generated data. For instance, there was evidence that thumb drives had been connected to Freckman's computer at Gen-Wealth on specified dates. The data did not, however, establish who connected the thumb drive. It also did not show what was on the thumb drive. It did not show whether specific files were copied to the thumb drive, and, assuming that files were transferred to the thumb drive, it could not have established who possessed the thumb drive thereafter or what might have happened to the files on the thumb drive. Therefore, even if there were artifacts that were lost from the laptop that Freckman had originally been provided by Korhorn Financial, the artifacts would not have established that Freckman himself copied confidential files, continued to possess confidential files, or that he transferred or disclosed them to a third party. Accordingly, the trial court did not clearly err when it determined that any data lost by the destruction of the hard drive was not material or relevant to the issues involved. See *Johnson Family Ltd Partnership*, 281 Mich App at 387. Given the minimal evidentiary value of any lost artifacts, the trial court would have abused its discretion had it sanctioned Freckman and Korhorn Financial by entering judgment in Gen-Wealth's favor. See *Thorne v Bell*, 206 Mich App 625, 633; 522 NW2d 711 (1994) (noting that, for discovery sanctions, a default judgment is the most extreme sanction possible and stating that a trial court can only impose such a sanction to punish "flagrant and wanton" violations).

Additionally, the trial court did not err to the extent that it declined to sanction Freckman and Korhorn Financial by indulging a dispositive presumption that the loss of the hard drive involved evidence that would have established one or more elements of Gen-Wealth's claims. Our Supreme Court has held that a trial court may—as a sanction for spoliation of evidence—instruct the jury to make every presumption that the destroyed evidence was adverse to the despoiler of the

evidence. See *Pitcher v Rogers' Estate*, 199 Mich 114, 121; 165 NW 813 (1917) (stating that the trial court properly applied the maxim: *omnia praesumuntur contra spoliatorem*—all things are presumed against the despoiler). Nevertheless, a trial court may not instruct a finder of fact to make an adverse presumption, as opposed to an adverse inference, arising from the loss of evidence unless the complaining party established that the party responsible for the lost evidence acted intentionally to destroy evidence and thereby suppress the truth. See *Ward v Consolidated Rail Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005) (quotation marks and citation omitted; alteration in original) ("It is well settled that missing evidence gives rise to an adverse presumption only when the complaining party can establish intentional conduct indicating fraud and a desire to destroy [evidence] and thereby suppress the truth."). See also MCR 2.313(D)(2)(c) (providing that a trial court may dismiss the case or enter a default judgment as a sanction for the failure to preserve electronically stored information, but only on a finding that the party acted with the intent to deprive another of the information's use in litigation).[3]

As already discussed, the trial court did not clearly err when it found that Korhorn Financial and Freckman did not cause the loss of the hard drive with the intent to destroy evidence. For that reason, a potential fact-finder would not be instructed on a presumption, but instead would merely be permitted to make adverse inferences. See *Ward*, 472 Mich at 84-85. Because the trial court must view the evidence presented on a motion for summary disposition in the light most favorable to the nonmoving party, see *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999), the trial court had to consider the inferences that a finder of fact might make from the loss of the hard drive, see *Ward*, 472 Mich at 85. Even assuming that the lost hard drive had artifacts on it that were not transferred to the hard drive that was actually examined, the inferences naturally arising from such artifacts could not have established the content of any file, who possessed such a file, and whether the file was disseminated to others. Given the complete absence of evidence that Freckman actually kept confidential files after his termination, the artifacts also could not have corroborated or lent weight to any evidence that could establish an essential element of Gen-Wealth's claims. Stated another way, there were no inferences that could be made regarding the lost evidence that would by itself save any of Gen-Wealth's claims. As such, the trial court did not misapply the law when it determined that the spoliation, such as it was, did not warrant any remedial measures because it did not prejudice Gen-Wealth. See *Franks*, 330 Mich App at 86; see also MCR 2.313(D)(1) (authorizing a trial court to take measures no greater than necessary to cure the prejudice caused by the failure to preserve electronically stored information). Under the totality of the circumstances, the trial court did not abuse its discretion when it chose not to impose a more severe sanction. See *Mitchell*, 321 Mich App at 153-154.

---

[3] Our Supreme Court amended MCR 2.313, effective January 1, 2020. See 503 Mich. The trial court relied on the version of MCR 2.313 then in force. Specifically, it relied on MCR 2.313(E), which then provided: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Because the current version of the court rules reflects the same basic policy considerations, we cite the current court rules.

## C. INTEREST OF JUSTICE

As noted, the trial court indicated in its opinion and order resolving the motions for summary disposition that some sanction would be appropriate for the loss of evidence, but it reserved the issue for later. The trial court returned to the issue after Gen-Wealth moved for sanctions. Although the trial court had the authority to order sanctions for the spoliation of evidence as part of its inherent powers, see *Bloemendaal*, 255 Mich App at 211, it determined that it would be more appropriate to handle the spoliation issue by adjusting the offer-of-judgment sanctions owed to Freckman and Korhorn Financial under the interest-of-justice exception for an award under MCR 2.405. Specifically, it reduced the award of attorney fees for Freckman and Korhorn Financial by one-half each of the amount of the reasonable costs and attorney fees incurred by Gen-Wealth in litigating the spoliation issue.

"[A] party may serve on the adverse party a written offer to stipulate to the entry of a judgment for the whole or part of the claim . . . ." MCR 2.405(B). If the adverse party rejects an offer of judgment and the finder of fact returns an adjusted verdict that is more favorable to the offeror, the rejecting party must pay the offeror's actual costs incurred. See MCR 2.405(D)(1). Actual costs include the reasonable attorney fees necessitated by the failure to stipulate to entry of the judgment. See MCR 2.405(A)(6).

In this case, there is no dispute that Freckman and Korhorn Financial made an offer of judgment, which Gen-Wealth rejected, and that the adjusted verdict was more favorable to them. See MCR 2.405(A)(4); MCR 2.405(D)(1). Accordingly, they were entitled to their actual costs unless the trial court exercised its discretion to refuse the award in the "interest of justice," as permitted by MCR 2.405(D)(3).

The purpose of the offer-of-judgment rule stated under MCR 2.405 is to encourage settlement and deter protracted litigation. *Stitt v Holland Abundant Life Fellowship*, 243 Mich App 461, 475; 624 NW2d 461 (2000) (citation omitted). To that end, this Court has stated that the interest-of-justice exception provided under MCR 2.405(D)(3) applies only in unusual circumstances. See *Derderian*, 263 Mich App at 390 (citation omitted). To hold otherwise would be to expand the exception to the point at which it would render the rule awarding actual costs ineffective to serve its goal. *Id*. at 390-391. Nevertheless, the exception exists to provide a trial court with the flexibility to exercise its discretion to prevent injustice—such as might be occasioned by a party who makes a de minimis offer of judgment, not with the intent to settle, but with the hopes of tacking attorney fees to the costs if successful in the litigation. *Sanders v Monical Machinery Co*, 163 Mich App 689, 692; 415 NW2d 276 (1987). Moreover, this Court has held that the power to refuse an award in the interest of justice necessarily encompasses the power to award less than a full award. See *Haliw v Sterling Heights*, 266 Mich App 444, 449-450; 702 NW2d 637 (2005) (construing the similarly worded interest-of-justice exception for case evaluation sanctions provided under MCR 2.403(O)(11)). The facts of this case supported the trial court's decision to adjust the award of actual costs under the offer-of-judgment rule.

The record showed that the parties engaged in contentious discovery battles that included disputes over whether Freckman and Korhorn Financial would have to submit their electronic devices—including Korhorn Financial's server—for examination. The trial court resolved these discovery disputes and entered orders compelling Korhorn Financial to submit the computer

-8-

provided to Freckman for examination. As such, both Freckman and Korhorn Financial were well aware of the need to protect electronic records for discovery. Despite this knowledge, Freckman and Korhorn Financial did not put into place simple steps to ensure that Korhorn Financial's information-technology personnel did not inadvertently destroy digital information. Had Freckman and Korhorn Financial informed the information-technology personnel of the need to preserve the hardware associated with Freckman's electronic devices, they might have spared the parties and court the time and expense associated with litigating the spoliation issue. In other words, the failure to take simple and reasonable steps to protect evidence undermined the very goal of the offer-of-judgment rule by encouraging further contentious litigation. Accordingly, the circumstances were unusual enough to support application of the interest-of-justice exception under MCR 2.405(D)(3).

The trial court carefully crafted a remedy that suited the harm at issue: it reduced the offer-of-judgment award by the amount of the fees that Gen-Wealth incurred as a result of the failure to preserve evidence. It also left intact the award of fees charged by the lawyers for Freckman and Korhorn Financial for the same dispute. The trial court's balancing of the competing interests upheld the goal of encouraging settlement without rewarding the countervailing concern created by the failure to take reasonably simple steps to preserve evidence. On this record, we conclude that the trial court's decision fell within the range of reasonable and principled outcomes. See *Mitchell*, 321 Mich App at 153-154.

The trial court did not err in its handling of the spoliation issue or the imposition and amount of the related sanctions.

## IV. SUMMARY DISPOSITION

Gen-Wealth also argues that the trial court erred when it dismissed several of its claims under MCR 2.116(C)(10). We disagree.

### A. STANDARDS OF REVIEW

This Court reviews de novo whether the trial court properly granted or denied a motion for summary disposition. *Maiden*, 461 Mich at 118. A motion for summary disposition is properly granted under MCR 2.116(C)(10) when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id*. at 120. This Court also reviews de novo whether the trial court properly applied the relevant court rules and statutes. *Franks*, 330 Mich App at 86. Finally, this Court reviews de novo whether the trial court properly applied common-law principles. *Roberts v Salmi*, 308 Mich App 605, 612; 866 NW2d 460 (2014).

### B. STATUTORY CONVERSION

Gen-Wealth first argues that the trial court erred when it dismissed its claim for statutory conversion. In its motion for summary disposition, Gen-Wealth argued that the undisputed evidence showed that Freckman converted its personal property. Namely, it argued that Freckman admitted to using Gen-Wealth's "assets under management" lists and told prospective employers about the number of clients that he managed while with Gen-Wealth. It further cited evidence that one of Freckman's meetings had been referred to as a "portability review meeting." Gen-Wealth felt that this evidence showed that Freckman converted its confidential information. The trial court

ultimately denied Gen-Wealth's motion and granted the motions by Freckman and Korhorn Financial because Gen-Wealth failed to establish that it suffered any damages related to the conversion of digital information, assuming that the digital information at issue was property that could be converted.

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Maiden*, 461 Mich at 120. When moving for summary disposition, the moving party must specifically identify the issues about which the moving party believes there are no genuine issues as to any material fact. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). The "moving party must support its motion with affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted." *Id*. at 369-370, citing MCR 2.116(G)(3). If the moving party properly supports its motion, the burden shifts to the opposing party to establish a genuine issue of disputed fact. *Barnard Mfg Co, Inc*, 285 Mich App at 370.

The Legislature provided that a person may recover "3 times the amount of actual damages, plus costs and reasonable attorney fees" if damaged as a result of another person's "stealing or embezzling property or converting property to the other person's own use." MCL 600.2919a(1)(a). The term "converting," as used in the statute, has acquired a peculiar meaning and refers to the common-law tort of conversion. *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 347-348; 871 NW2d 136 (2015). Accordingly, to establish a claim for statutory conversion under MCL 600.2919a, the claimant must establish the common-law elements of conversion in addition to the extra elements identified under the statute. *Id*. at 354-357.

Conversion has been described as any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with that person's rights. *Foremost Ins Co v Allstate Ins Co*, 439 Mich 378, 391; 486 NW2d 600 (1992). Because conversion involves wrongfully asserted dominion over property, Gen-Wealth had to demonstrate that it owned the property at issue and that its rights in the property were superior to any right that Freckman and Korhorn Financial might have had. See *Hance v Tittabawassee Boom Co*, 70 Mich 227, 231; 38 NW 228 (1888) (stating that to "authorize recovery in an action of trover, the plaintiff must prove his ownership, absolute or qualified, of the property described in his declaration"); *Thomas v Watt*, 104 Mich 201, 207; 62 NW 345 (1895).

Gen-Wealth argued that it owned confidential information that Freckman converted with Korhorn Financial's participation. More specifically, it relied on the evidence that Freckman revealed what it characterized as its assets-under-management list and identified the number of clients that he serviced.

It is not clear that this information constitutes property that is capable of being converted. Our Supreme Court has held that an action for trover will not lie for intangible property, such as a business's goodwill. *Powers v Fisher*, 279 Mich 442, 449; 272 NW 737 (1937). And our Supreme Court has continued to describe a claim for conversion as applying to tangible chattel property. See *Thoma v Tracy Motor Sales, Inc*, 360 Mich 434, 438-439; 104 NW2d 360 (1960). Nevertheless, this Court has recognized that common-law conversion had been extended to some forms of intangible property; more specifically, Michigan courts have extended the tort to cover

intangible property that was represented or connected by something tangible. *Sarver v Detroit Edison Co*, 225 Mich App 580, 585-586; 571 NW2d 759 (1997). Additionally, the intangible must be of a kind that is capable of being owned and possessed to the exclusion of others—that is, the intangible item must possess property-like traits. *Id*.

In this case, Gen-Wealth did not identify any tangible personal property that Freckman converted. Instead, it insisted that it owned the information concerning the total value of the assets under Freckman's management and the number of clients that he had when he worked for Gen-Wealth. It further argued that Freckman converted that information by relating it to others. Notably, the assets under management and number of households behind the total assets were not associated with anything tangible. See *id*. at 586. Additionally, the information was not the kind of intangible that had property-like traits. The information constituted figures with no novel or unique characteristics; it was not the result of any creative process or system that required investment or development; and was not something that could be assigned to others. See *id*. at 586-587. Indeed, there is no evidence that the figures at issue were even accurate.

There was also no evidence that the figures had independent value. Although Gen-Wealth argued that such figures are commonly used to value a business, knowledge of the figure does not itself have any value; it is the actual clients and assets that provide the value. Gen-Wealth claims that the evidence that Korhorn offered to purchase the "assets[-]under[-]management" list shows that the figure has independent value. Gen-Wealth's argument is not supported by the record or common sense. Korhorn did not offer to purchase the raw information about assets—he offered to purchase Freckman's book of business. Accordingly, this evidence only established that Korhorn valued the book of business.

Gen-Wealth also presented no evidence that the information about the assets under management represented by a particular book of business has any value. The United States Supreme Court has held that a state may create property rights in information by enacting statutes that protect that information as a trade secret. See *Ruckelshaus v Monsanto Co*, 467 US 986, 1001-1004; 104 S Ct 2862; 81 L Ed 2d 815 (1984). However, as will be discussed, Gen-Wealth failed to present any evidence that the assets under management and the associated number of clients had independent economic value from not being generally known by others who could otherwise obtain economic value from the information's use. See MCL 445.1902(d).

In any event, even assuming that these data points could constitute property that was capable of being converted, Gen-Wealth failed to establish that it suffered any damage from Freckman's wrongful exercise of dominion over the information. Under the common law, the person whose property has been wrongfully converted would be entitled to the value of the property at the time of the conversion. *Ehman v Libralter Plastics, Inc*, 207 Mich App 43, 45; 523 NW2d 639 (1994). "However, if the property converted does not have a regular market value, the measure of damages is the value of the property to the owner at the time of the conversion." *Id*. In cases in which the property is returned to the owner, the measure is the loss in value to the owner. See *Magley v M & W Inc*, 325 Mich App 307, 317; 926 NW2d 1 (2018).

Gen-Wealth did not present any evidence that the figures at issue had any independent market value. It also did not present any evidence tending to show how the revelation of the figures to others might have affected the value of the figures to Gen-Wealth. Gen-Wealth asserted that it

had damages in the form of attorney fees and expert costs, but its fees and costs are not recoverable in the absence of evidence that it suffered actual damages. See MCL 600.2919a(1) (stating that only a "person damaged" as a result of a conversion may recover "3 times the amount of actual damages sustained, plus costs and reasonable attorney fees[.]"). Gen-Wealth also asserts that it suffered damages in the form of lost revenue that occurred when some clients moved their assets to a bank. Gen-Wealth did not identify the clients who moved the accounts, the value of those accounts, or any evidence of a causal connection between the accounts that were moved and Freckman's purported conversion of the data points. Gen-Wealth's assertion that Freckman's revelation of the data caused the loss of clients was speculative, see *Skinner v Square D Co*, 445 Mich 153, 164-166; 516 NW2d 475 (1994), and, given the inadequacy of its evidence, it involved a mere promise to provide evidence at trial. Gen-Wealth could not establish a question of fact through speculation, *Hall v Consol Rail Corp*, 462 Mich 179, 187; 612 NW2d 112 (2000), and could not avoid summary disposition by promising to present evidence at trial, *Maiden*, 461 Mich at 121.

Because Gen-Wealth did not present any evidence that it suffered actual damages, which was an essential element of statutory conversion, see MCL 600.2919a(1), there was no factual dispute for the jury to resolve. See *New Freedom Mtg Corp v Globe Mtg Corp*, 281 Mich App 63, 69-70; 761 NW2d 832 (2008) (stating that summary disposition is appropriate when damages are an essential element of a claim and the plaintiff had failed to present any evidence of damages), overruled in part on other grounds *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 99; 878 NW2d 816 (2016). See also *Skinner*, 445 Mich at 174 ("[L]itigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess.").

The trial court did not err when it dismissed Gen-Wealth's claim for statutory conversion.

## C. REPLEVIN

Gen-Wealth further claims that the trial court should not have dismissed Count IV of its complaint because it presented evidence that Freckman and Korhorn Financial wrongfully retained its property. In Count IV of its complaint, Gen-Wealth asserted a claim for replevin and demanded the return of property that Freckman or Korhorn Financial might have in their possession. Gen-Wealth argued before the trial court that the evidence showed that Freckman had in his possession copies of its confidential information, such as its assets-under-management list and copies of reports run on its client management software, Redtail. The trial court, however, disagreed. It determined that an action for replevin applied only to tangible property, and it noted that Gen-Wealth failed to present any evidence that Freckman or Korhorn Financial had any tangible property that belonged to Gen-Wealth.

The claim formerly known as "replevin" is now known as "claim and delivery." *Whitcraft v Wolfe*, 148 Mich App 40, 44 n 1; 384 NW2d 400 (1985). Claim and delivery seeks the return of wrongfully held property and damages for the period of wrongful detention. MCR 3.105(A). An action for claim and delivery applies only to tangible "goods or chattels," MCL 600.2920(1), not to intangible property, see *Sparling Plastic Indus, Inc v Sparling*, 229 Mich App 704, 714; 583 NW2d 232 (1998). Accordingly, Gen-Wealth could not rely on evidence that Freckman recalled confidential information from memory in order to establish the elements of claim and delivery.

Rather, Gen-Wealth had to present evidence that Freckman or Korhorn Financial had tangible goods or chattels that could be returned to Gen-Wealth. See *id*.

Gen-Wealth asserted that Freckman had run numerous reports from the Redtail software, which established that he still had physical copies of the reports after he left Gen-Wealth. Specifically, Gen-Wealth maintained that Freckman must have had copies because he failed to account for all the reports. As the trial court correctly noted, the evidence that Freckman ran reports did not establish that Freckman invariably generated a hard copy of the report. Moreover, Freckman testified that he did not retain any physical materials from Gen-Wealth. He explained that he delivered any physical copies to the proper person and shredded the remainder. Gen-Wealth presented no evidence to contradict that testimony.

Gen-Wealth also makes much of the evidence that Freckman scheduled a meeting with a prospective employer that was identified as a portability review. Gen-Wealth maintains that that label demonstrated that Freckman had physical copies of confidential information about Gen-Wealth's clients that Freckman submitted because such documentation would be essential to a determination of portability for a book of business. The label does not bear the evidentiary weight that Gen-Wealth would have it bear. The label permits an inference that the prospective employer was interested in whether Freckman had a portable book of business, but it does not permit an inference that Freckman had physical copies of confidential records suitable for determining the portability of his book of business. Indeed, Freckman was well aware of the restrictions on his ability to solicit clients and compete with Gen-Wealth and could have satisfied any questions about the portability of his book of business by informing the prospective employer that he had no portable book of business.

Because Gen-Wealth did not present any evidence that permitted an inference that Freckman or Korhorn Financial had any tangible property that belonged to Gen-Wealth, the jury would have been left to guess about the existence of such goods or chattels. See *Skinner*, 445 Mich a 174. Consequently, the trial court did not err when it dismissed the claim-and-delivery count under MCR 2.116(C)(10).

### D. TRADE SECRETS

We next address Gen-Wealth's claim that the trial court erred when it dismissed its claim under Count I of its amended complaint. Under Count I, Gen-Wealth asserted that Freckman and Korhorn Financial violated Michigan's Uniform Trade Secrets Act by misappropriating Gen-Wealth's confidential information. The trial court dismissed Count I because Gen-Wealth failed to establish that Freckman or Korhorn Financial misappropriated any information that amounted to a trade secret.

The Legislature provided that a person may recover damages for the misappropriation of a trade secret. See generally MCL 445.1901 *et seq*. The damages "include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." MCL 445.1904. In the absence of other reasonable measures, "the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id*.

In the trial court, Gen-Wealth argued that Freckman acquired knowledge of Gen-Wealth's trade secret involving the number of households that Freckman managed while with Gen-Wealth and the total of the assets that he held under management at that time. Gen-Wealth noted that the trade secret was covered by its confidentiality agreement with Freckman. It claimed that Freckman violated the confidentiality agreement and misappropriated the trade secret by revealing it to prospective employers, including Korhorn Financial.

The Legislature defined a "misappropriation" to mean:

(*i*) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(*ii*) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake. [MCL 445.1902(b).]

Freckman's revelation of this information to Korhorn Financial when Korhorn Financial knew that Freckman acquired the information improperly could constitute a misappropriation, if the information constituted a trade secret. The Legislature defined a trade secret to encompass:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(*i*) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(*ii*) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [MCL 445.1902(d).]

Gen-Wealth's evidence that it took steps to protect client information with the confidentiality agreement, as the trial court aptly noted, was not enough to establish that the information covered by the agreement was a trade secret. The information must be both the "subject of efforts . . . to maintain its secrecy" and must derive "independent economic value . . . from not being generally known . . . to persons who can obtain economic value from its disclosure or use." MCL 445.1902(d). Under the plain language of this definition, information that does not derive value from being secret does not qualify as a trade secret. See *Stromback v*

*New Line Cinema*, 384 F3d 283, 305 (CA 6, 2004) (stating that the "essence of a trade secret is that it derives value from secrecy.").[4]

Gen-Wealth presented no evidence that the information concerning the number of households that Freckman managed while with Gen-Wealth and the total assets under his management had any value, let alone independent economic value that derived from being secret. MCL 445.1902(d)(*i*). As already discussed, Gen-Wealth asserted that Korhorn's offer to purchase the assets-under-management information constituted evidence that Korhorn Financial valued the information, but the evidence actually showed that Korhorn offered to by the book of business, not the information concerning the total amount of assets represented by that book of business. There was no evidence that Gen-Wealth derived any economic value from keeping secret information about the number of households that Freckman managed and the associated combined value of the assets managed for those households. There was similarly no evidence that Gen-Wealth's competitors could gain any economic advantage by having that information. See MCL 445.1902(d)(*i*) (stating that the independent value must derive from not being generally known to "persons who can obtain economic value from its disclosure or use."). Because there was no evidence that those figures had independent economic value, Gen-Wealth failed to establish that the information constituted a trade secret.

Gen-Wealth also relies on the theory of inevitable disclosure to argue that its claim under the Trade Secret Act should have survived summary disposition. This Court has acknowledged that federal authorities have held that the inevitable disclosure theory allows a plaintiff to prove misappropriation by demonstrating that the defendant's new employment will inevitably lead him or her to rely on the plaintiff's trade secrets. See *CMI Int'l, Inc v Intermet Int's Corp*, 251 Mich App 125, 132-133; 649 NW2d 808 (2002). This Court accepted that theory, but held that "for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." *Id*. at 134.

Gen-Wealth failed to present any evidence that Freckman would inevitably use its trade secrets in his new employment. Gen-Wealth claims that Freckman's misuse of trade secrets was inevitable because Korhorn Financial had no basis for hiring Freckman unless Freckman intended to benefit Korhorn Financial with his knowledge of Gen-Wealth's trade secrets. However, that argument is pure speculation. There was no evidence that Freckman had in fact used, or intended to use, Gen-Wealth's confidential information to compete against Gen-Wealth. Indeed, the evidence showed that he moved to Indiana and worked with Korhorn Financial's existing clients in that state. There was no evidence that Korhorn Financial hired Freckman for any reason other than because he was a competent financial advisor. Stated another way, there was no evidence that Freckman's skills as an advisor were limited to his ability to exploit trade secrets. An employee has the right to change jobs and the mere fact that the employee might use his skills for

---

[4] Although decisions by lower federal courts are not binding on this Court, they may be persuasive. See *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004).

-15-

another employer is not enough to establish a misappropriation of a trade secret. See *Hayes-Albion Corp v Kuberski*, 421 Mich 170, 183-184, 188; 364 NW2d 609 (1984).

On this record, Gen-Wealth presented no evidence beyond its belief that Freckman might at some point use information that he gleaned while working for Gen-Wealth to compete with Gen-Wealth. Gen-Wealth's speculation is not sufficient to establish a question of fact for the jury regarding whether Freckman had or would violate the Trade Secrets Act. See *Hall*, 462 Mich at 187. The trial court did not err when it dismissed Gen-Wealth's claim under the Trade Secrets Act.

## E. FIDUCIARY DUTY

Finally, Gen-Wealth maintains that the trial court should not have dismissed its claim that Freckman breached the fiduciary duties that he owed Gen-Wealth. Gen-Wealth alleged that Freckman breached the fiduciary duties that he owed when he disclosed confidential information to prospective employers, such as Korhorn Financial. The trial court held that Gen-Wealth failed to establish that Freckman owed it any fiduciary duties after it terminated his employment and failed to establish that Freckman breached any fiduciary duties.

To establish a claim for breach of fiduciary duty, Gen-Wealth had to establish that Freckman owed it a fiduciary duty, that Freckman breached that duty, and that his breach caused damages. See *Highfield Beach at Lake Mich v Sanderson*, 331 Mich App 636, 666; 954 NW2d 231 (2020). Whether a person owes another a fiduciary duty depends on the relationship between the parties: "The duty arises out of the relation subsisting between two persons of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith." *Portage Aluminum Co v Kentwood Nat'l Bank*, 106 Mich App 290, 294; 307 NW2d 761 (1981).

Gen-Wealth relies in part on the fact that Freckman was its employee and that employees owe a fiduciary duty to their employers. It is well-settled that employees are agents of their employers. See *Breighner v Mich High Sch Athletics Ass'n Inc*, 255 Mich App 567, 582-583; 662 NW2d 413 (2003) (stating that an agency relationship arises when one person (the principal) authorizes another (the agent) to act on his or her behalf such that the agent's actions may bind the principal). See also *Lincoln v Fairfield-Noble Co*, 76 Mich App 514, 519; 257 NW2d 148 (1977) (recognizing that all employees are agents, but that not all agents are employees). As an employee, Freckman did owe Gen-Wealth a duty of "honesty, loyalty, restraint from self-interest and good-faith." *In re Green Charitable Trust*, 172 Mich App 298, 313; 431 NW2d 492 (1988). Those duties, however, persisted only for the duration of Freckman's agency relationship with Gen-Wealth. See *Central Cartage Co v Fewless*, 232 Mich App 517, 524-525; 591 NW2d 422 (1998). Accordingly, Freckman's fiduciary duties ended when Gen-Wealth terminated his employment.

Gen-Wealth did not present any evidence that Freckman breached his duty of loyalty and fair dealing before it terminated his employment. Looking for new employment and planning to compete with one's employer does not by itself constitute a wrong. See, e.g., *Meyers v Roger J. Sullivan Co*, 166 Mich 193, 196-197; 131 NW 521 (1911). Rather, there must be evidence that the employee acted in a way that was adverse to his employer's interests in the matters entrusted to the employee's care during the term of the agency. See *Stephenson v Golden*, 279 Mich 710,

736-737; 276 NW 849 (1937).  The only evidence that Gen-Wealth presented that might arguably involve a breach of loyalty involved actions that Freckman took after his employment had been terminated.  Gen-Wealth also did not present any evidence that the relationship between Freckman and Gen-Wealth after his termination was such as would give rise to any fiduciary duties.  The fact that Freckman was still bound by his confidentiality agreement with Gen-Wealth did not, absent more, create a fiduciary relationship because ordinary contractual agreements do not establish fiduciary relationships.  See, e.g., *Farm Credit Serv of Mich's Heartland, PCA v Weldon*, 232 Mich App 662, 680; 591 NW2d 438 (1998) (stating that a fiduciary relationship does not arise from a lender-borrower relationship because such contracts do not involve the reposing of faith, confidence, and trust or the placing of reliance by one on the judgment and advice of another).

Because Gen-Wealth failed to present any evidence that Freckman engaged in conduct that amounted to a breach of fiduciary duty during the existence of a fiduciary relationship, the trial court did not err when it dismissed Gen-Wealth's claim for breach of fiduciary duty.

## V.  CONCLUSION

The parties have not established that the trial court erred in any respect.  Therefore, we affirm the trial court's orders.

Affirmed.  Freckman and Korhorn Financial may tax costs for Gen-Wealth's violations of MCR 7.212.  MCR 7.219(I).

/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto
/s/ Anica Letica

-17-